278 N.J. Super. 295 (1995)
650 A.2d 1035
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
W.L., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1994.
Decided January 3, 1995.
*297 Before Judges PRESSLER, LANDAU and NEWMAN.
James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Joseph Connor, Jr., Assistant Prosecutor, argued the cause for respondent (W. Michael Murphy, Jr., Morris County Prosecutor, attorney; Mr. Connor, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*298 Following a trial by jury, defendant W.L. was convicted of four first-degree and three second-degree crimes of sexual abuse of which the victim was D.L., one of his six children and the oldest of his three daughters. The gravamen of the charges is that from the time D.L. was seven years old until she was seventeen, defendant abused her by way of sexual contact which escalated into intercourse by the time she was thirteen. He was sentenced to consecutive terms of twenty years on two of the first-degree convictions and to unspecified concurrent terms on the remaining convictions.
In appealing from the judgment of conviction, defendant raises the following issues:
I. THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS DENIED BY THE PROSECUTOR'S SUMMATION CHARACTERIZING THE CSAAS FACTORS AS "INDICATORS" OF SEXUAL ABUSE; HER ARGUMENTS THAT BASED UPON THE EXPERT'S TESTIMONY, DEFENDANT WAS "THE TYPE OF PERSON" LIKELY TO ENGAGE IN DEVIANT BEHAVIOR; AND THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE FUNCTION OF CSAAS EVIDENCE. (Not raised below)
II. SINCE THE STATE HAD PRESENTED EVIDENCE THAT ANOREXIA WAS COMMONLY ASSOCIATED WITH SEXUAL ABUSE, IT WAS FUNDAMENTALLY UNFAIR AND A VIOLATION OF THE CONFRONTATION CLAUSE TO PRECLUDE THE DEFENSE FROM INTRODUCING THOSE PORTIONS OF D.L.'S DIARIES IN WHICH SHE ATTRIBUTED HER ANOREXIA TO THE FACT THAT HER BOYFRIEND HAD USED HER SEXUALLY, AND INDICATED THAT SHE HAD BEEN RAPED BY ANOTHER PERSON.
III. THE STATE'S EXPERT'S TESTIMONY THAT ON THE "CHILD ABUSE POTENTIAL INVENTORY" TEST ADMINISTERED TO DEFENDANT, "THE FAKING GOOD INDEX WAS HIGHLY ELEVATED" (MEANING THAT HE "WASN'T GIVING US HONEST ANSWERS," BUT WANTED TO APPEAR "HEALTHY"), WAS HIGHLY IMPROPER, AND DENIED DEFENDANT A FAIR TRIAL. (Not raised below)
IV. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO HIS ATTORNEY'S FAILURE TO MOVE FOR A PRETRIAL HEARING ON THE ADMISSIBILITY OF PORTIONS OF THE DIARY; HIS FAILURE TO OBJECT TO THE TESTIMONY ABOUT THE DEFENDANTS SCORES ON THE FAKING GOOD INDEX OF THE CHILD ABUSE POTENTIAL INVENTORY; HIS FAILURE TO *299 OBJECT TO THE PROSECUTOR'S SUMMATION THAT THE CSAAS FACTORS WERE "INDICATORS" OF CHILD ABUSE; AND HIS FAILURE TO REQUEST A LIMITING INSTRUCTION EXPLAINING THAT THE CSAAS FACTORS WERE NOT SUBSTANTIVE EVIDENCE OF GUILT. (Not raised below)
V. THE SENTENCE WAS IMPOSED IN VIOLATION OF THE SENTENCING GUIDELINES OF THE CODE, AND IS PARTIALLY ILLEGAL. (Not raised below)
A. The Decision To Impose the Maximum Sentence on Both Count Two and Count Three Violated The Sentencing Guidelines of the Code.
B. The Judgment of Conviction is Incorrect In Listing Counts One, Six and Seven as First Degree Crimes.
C. The Imposition of "Concurrent" Terms on Counts One, Four, Five, Six and Seven was Insufficient; The Case Must Be Remanded For Resentencing on Those Counts.
We reverse. Our review of this record satisfies us that the trial was irretrievably tainted by plain error in the use of expert testimony and by harmful error in evidential rulings.
There is no need for extensive recitation of the facts. At the time of this trial in February 1992, defendant and his wife C.L. had been married for twenty-six years, enjoying a stable and mutually supportive relationship. The three older children, their sons, were then 24, 23 and 22. The three younger, their daughters, were then 18, 17 and 12. The family had lived, since the parents' marriage, in half of a duplex house. C.L.'s mother lived in the other half. The six children occupied the three upstairs bedrooms and the parents used the downstairs living room as their bedroom, sleeping on a convertible couch.
Insofar as this record indicates, the asserted victim, D.L., was a troubled child at least from the time she was thirteen years old. She claims to have been then raped by an older boy. She also, at that age, began a long-lasting and apparently obsessive and unhappy relationship with P.D., a boy four or five years older, to whom her parents objected because of the age difference. D.L. had frequent quarrels with her father on this account. By the time she was sixteen, she became a serious anorectic and was hospitalized for nine weeks. During that time, as part of her rehabilitative program, she kept a diary which included both *300 mundane daily entries and expressions of her most intimate thoughts. Among the latter were her reflections on P.D. to whose abuse she attributed her problems, including her anorexia. Her conduct at about this time also included some self-mutilative behavior; she carved messages into her arms.
D.L.'s problems at home apparently came to a climax of sorts some time after her release from the hospital when she was seventeen. She was then employed at night at a Roy Rogers restaurant, returning home from work by 11:30. One night, instead of coming home, she went out with P.D., returning after 2:00 a.m. Her father, who testified as to his extreme anxiety over her non-arrival home, confronted her upon her return and apparently struck her. It was not long after that she moved out of the house and sought out a school guidance counselor to whom she showed poetry she had written in which she accused her father of having sexually molested her. The counselor immediately advised the Division of Youth and Family Services of the accusation, defendant was arrested, and these proceedings eventually ensued.
At trial D.L. testified to sexual contact with her father starting when she was seven years old. She testified that as the whole family was gathered in the living room watching television, her father would ask her to scratch his back. She would climb up behind him, he would cover them both with a blanket, and would then fondle her. By the time she was eleven, she said, he would take her down to the basement, where the laundry facilities were located, and rub against her. By the time she was thirteen, she testified, he had penetrated her. These frequently occurring visits to the basement, she testified, generally took place during the time between her father's arrival home from work at 4:30 and her mother's arrival home from work an hour or so later. At least some of the other children, she testified, were usually in the house at that time. When no one was home, she said, her father sometimes violated her in the kitchen. D.L. also claimed that her father gave her money for submitting to him, that he told her her mother must never know, and that it was his habit to insist on sex *301 with her before she went out on a date. D.L. also testified that she tried to tell her mother in an ambiguous note what was happening to her, but then, when she saw how upset her mother was, denied that any of her disclosures or accusations were true.
Defendant, who testified on his own behalf, denied that any of these acts had ever taken place. D.L.'s mother, both of her sisters and one of her brothers also testified, asserting that none of them had ever had the slightest intimation that any sexual contact had occurred between D.L. and her father, all of them also asserting that they would have known or at least had had suspicions if anything of the kind had ever happened.
There was virtually no corroborating evidence. The trial was, in effect, a credibility contest between father and daughter. The jury deliberated for three days, confirming our own evaluation of the State's case as far from overwhelming. The question of defendant's guilt was, at best, exceedingly close. It is, therefore, clear that any error that could have appreciably tipped the credibility scale would have to be regarded as plain error having the capacity to have affected the outcome of the trial. We are satisfied that such error occurred in the State's use of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence.
We need not retread the path so recently traversed by State v. J.Q., 252 N.J. Super. 11, 599 A.2d 172 (App.Div. 1991), affirmed, 130 N.J. 554, 617 A.2d 1196 (1993), in which CSAAS evidence and the extent of its admissibility were carefully explained. Suffice it to say that expert testimony respecting the syndrome is not admissible as substantive evidence. That is, it is not admissible as proof that a child who exhibits the behavior constituting the syndrome was actually abused. Said another way, proof that a child's conduct accorded with all or most of the five patterns of behavior embraced by the syndrome[1] is not *302 evidence of defendant's guilt. Rather CSAAS evidence is admissible to shield the child from the inference that she is not telling the truth which might otherwise arise in the minds of jurors by reason of her failure to have promptly disclosed the fact that she was abused or her failure to have promptly sought help from a responsible adult. As we understand the holding of J.Q., therefore, the role of CSAAS evidence is the other side of the coin of fresh complaint evidence and fulfills the same function, namely, to respond to preconceived but not necessarily valid ideas jurors may have regarding the consistency of the post-assault conduct of a victim who claims to have been sexually abused with the fact of an actual act of abuse. See, generally, State v. Hill, 121 N.J. 150, 578 A.2d 370 (1990). In sum, CSAAS evidence is admissible to support or rehabilitate, as it were, the credibility of the victim whose post-assault conduct may be misperceived by the jury as inconsistent with the truth of her claims. See also State v. Michaels, 264 N.J. Super. 579, 625 A.2d 489 (App.Div.), certif. denied, 134 N.J. 476, 634 A.2d 523 (1993).
This case was tried after the Appellate Division decision in J.Q. but before the Supreme Court affirmance. The attorneys and the court were, therefore, aware that the State's psychologist, offered as an expert in child sexual abuse, was precluded from testifying as to his own opinion of D.L.'s truthfulness and as to whether D.L.'s behavioral patterns meant that she was a child sexual abuse victim. But it is also clear that counsel and the court did not appreciate the limited role of that evidence as supporting the victim's credibility rather than as proving that the crime against her was committed by defendant. It was that lack of appreciation that led to the plain error here. Most egregious was the court's failure to give the jury a limiting instruction as to the use it could make of the CSAAS evidence. This was a failure whose consequences were significantly exaggerated by several trial events.
Thus, one of the State's witnesses was the high school guidance counselor to whom D.L., then seventeen, had made her *303 first disclosure. The judge carefully and correctly charged the jury respecting this "fresh-complaint" evidence not only at the time it was offered but in his final instructions as well. The highlighting of the limited purpose of the fresh-complaint evidence without a like limitation being placed on the CSAAS evidence could only have reinforced the jury's impression that the CSAAS evidence was substantive proof. That impression, moreover, was, in our view, indelibly created by these trial occurrences. First, the psychologist, in explaining the syndrome to the jury, did so by tracking D.L.'s testimony and in that way, vouching for her credibility. That is to say, each of the five basic patterns of the syndrome may be manifested by a wide variety of specific behaviors. The specific behaviors referred to by the psychologist in his explanation of the syndrome to the jury, were exclusively those that had already been testified to by D.L., inevitably underscoring in the jurors' minds the notion that these behaviors were probative of the fact of abuse. The tenor of the prosecutor's summation, moreover, repeatedly focused upon syndrome patterns as "signals" and "indicators" of the fact that D.L. had been abused, equating both directly and by inference victim behavior that is consistent with the syndrome as actual proof of sexual abuse. That this was the prosecutor's quite purposeful theme was well-illustrated by this exchange during the cross-examination of defendant's psychology expert:
Q. You would agree, however that it [CSAAS syndrome] is a very good and useful tool, clinically, to indicate whether there is child sexual abuse, yes or no? Yes or no, doctor?
A. No. I agree that it is a useful tool to use in the investigation. As far as proving or disproving 
Q. That wasn't my question, doctor.
A. I'm sorry, please repeat the question.
Q. My question is, you have testified before that you agree that this syndrome is a good and useful tool in your clinical evaluations, yes or no?
A. Yes.
We are aware that defense counsel did not request a limiting instruction and did not object to either the testimony or the summation. Since, however, the trial took place before the Supreme *304 Court's J.Q. opinion, we do not hold him to the Supreme Court's admonition that "[i]n future cases, we shall assume that the failure of informed defense counsel to object to such expert testimony may reflect a tactical decision by the defense to let the jury hear all available information pertaining to the case." 130 N.J. at 584, 599 A.2d 172. Nor can we assume from this record that counsel's awareness of the Appellate Division's opinion in J.Q. constituted an informed appreciation of its significant evidential holdings. We are satisfied, therefore, that the plain error standard applies, and we are convinced that the manner in which the CSAAS evidence was handled here constituted plain error.
Quite apart from the CSAAS evidence, there was another, to our minds, egregious misuse of behavioral science evidence. After D.L.'s disclosures were finally made known to the authorities, the State's psychologist administered a whole battery of psychological tests to defendant. One of them is called the Child Abuse Potential Inventory. While the test was not explained in any detail, its name is at least suggestive if not self-descriptive. It would surely be understood by the jury as indicating whether the person tested was likely to be a child sexual abuser. On questioning by the prosecutor on re-direct examination, the psychologist explained, rather startlingly, that defendant's responses on this test indicated to him that defendant's "faking good index" was "highly elevated" indicating that "[h]e wasn't giving us honest answers with regard to that test...."
This testimony was objectionable and prejudicial in the extreme. There was absolutely no foundation laid as to what the test consisted of, how it is used or regarded by the scientific community, whether it is regarded as reliable by the scientific community, what it is supposed to prove or indicate, or anything else about it that would render the test results admissible for any purpose. See, generally, State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984). Beyond that, the testimony did not merely impugn defendant's credibility by way of the expert's expression of opinion regarding his truthfulness. That would have been bad enough. See, e.g., *305 J.Q., supra, 252 N.J. Super. at 39, 599 A.2d 172. Rather, it purported to do so on a scientific basis, namely, the Child Abuse Potential Inventory test. We see this testimony as no different in plain error terms from the unstipulated testimony by an expert that defendant failed a polygraph test. See, e.g., State v. Melvin, 65 N.J. 1, 16, 319 A.2d 450 (1974). The testimony was rendered even more damaging by the prosecutor's statement in summation that defendant was the "type of individual" who was likely to engage in "deviant conduct." The capacity both of the testimony itself and the prosecutor's apparent reliance on it in summation to have tipped the credibility scale is obvious. Defense counsel did not object. But we have no doubt that this too was plain error.
Finally, we address the admissibility of the diaries that D.L. kept while hospitalized for treatment of her anorexia. We understand that the judge's inadmissibility ruling was based on the so-called rape-shield law, N.J.S.A. 2C:14-7, which bars evidence of the victim's alleged prior sexual activity in the absence of a specific relevant purpose beyond impugning her reputation. To begin with, it is now well settled that the statutory specification of permissible relevant purposes must be read as illustrative rather than exhaustive. State v. Budis, 125 N.J. 519, 593 A.2d 784 (1991), affirming 243 N.J. Super. 498, 580 A.2d 283 (App.Div. 1990); State v. Ross, 249 N.J. Super. 246, 592 A.2d 291 (App.Div. 1991). We recognize defense counsel's failure to have clearly articulated the asserted admissible purpose of the diaries as well as his failure to have sought to have the issue of admissibility determined at the required pretrial hearing. Nevertheless we are satisfied that there was patent good and relevant reason to admit the diaries. Because of D.L.'s repeated references in the diaries to having been abused by P.D. and sexually used by him during an extended period of time, and because she herself attributed her anorexia to her feelings about that relationship, it was powerful and critical evidence in rebuttal of the State's theory that D.L.'s behavioral patterns and particularly the anorexia which was the centerpiece *306 thereof were the result of her father's abuse. It was error to exclude the diaries for that purpose.
Because the case must be retried, we do not address either the asserted ineffective assistance of counsel or the quantum of the sentence imposed. We note, however, the error of the court's failure to assign specific terms to each conviction.
Reversed and remanded for a new trial.
NOTES
[1] The patterns, as described by J.Q., 130 N.J. at 568-570, 599 A.2d 172, are secrecy, helplessness, entrapment and accommodation, disclosure that is delayed, conflicted and unconvincing, and retraction.