279 N.J. Super. 555 (1995)
653 A.2d 1139
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
VINCENT BRIGGS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1995.
Decided February 14, 1995.
*556 Before Judges PRESSLER, LANDAU and CONLEY.
Susan L. Reisner, Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender of counsel and on the letter brief).
Maryann K. Bielamowicz, Mercer County Prosecutor, attorney for respondent (Stacey M. Palagano, Assistant Prosecutor, of counsel and on the letter brief).
Vincent Briggs filed a pro se supplemental brief.
The opinion of the court was delivered by CONLEY, J.A.D.
Following a jury trial, defendant was convicted of murder, N.J.S.A. 2C:11-2 (count one); possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4 (count two); and possession of a handgun without a permit, N.J.S.A. 2C:39-5c(1) (count three). Counts two and three were merged with count one. A life term with a thirty-year parole disqualifier was imposed, as well as a $30 Violent Crimes Compensation Board penalty.
On appeal, defense counsel contends reversible error in the admission of the hearsay statement of Robin Austell through the testimony of Tracy Edwards who recounted an alleged conversation he had with defendant while both were incarcerated in the Mercer County Detention Center and while defendant was awaiting trial. In return for his disclosure to the prosecutor of the alleged conversation, Edwards received a substantially reduced sentence on his pending second degree charge. Allegedly included in that conversation was the Austell statement. In his supplemental pro se brief, defendant contends that out-of-court identifications *557 were the result of an unduly suggestive photographic line-up, that he was denied due process because he was not able to fully disclose the fact that Robin Austell and Tracy Edwards were represented by the same attorney at the time of both her alleged police statement and defendant's alleged conversation with Edwards, that the verdict was against the weight of the evidence, that the prosecutor engaged in misconduct in his summation, and that the cumulative effect of the trial errors requires a new trial.
We are confident that all of these contentions are without merit, except the admission of Robin Austell's statement coupled with the peculiar circumstances surrounding the dual representation of Austell and Edwards. Before discussing the statement, however, we comment briefly on the identification procedures. Both eyewitnesses who identified defendant through the photographic line-up, admitted during the Wade[1] hearing and during the trial that defendant's photograph was the only one that fit all of the descriptive characteristics they had given to the police. But our own independent review of the photographs, of the transcript of the Wade hearing and of the trial judge's findings, convinces us that the trial judge did not err in concluding that the line-up was not "so impermissibly suggestive as to give use to a very substantial likelihood of irreparable misidentification." State v. Clausell, 121 N.J. 298, 324-326, 580 A.2d 221 (1990) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)).
In affirming the trial judge's Wade determination, however, we do not mean to suggest that there were not, nonetheless, serious problems with the identification, as well as the jury conviction, of defendant as the perpetrator of the murder. Suffice it to say, the State's case was riddled with problems. In addition to the admission by the eyewitnesses that only defendant's photograph contained all of the identifying characteristics, one of them, Willie Harris, when first shown the line-up, proclaimed an inability to *558 identify anyone. Shortly after the second witness, David Munn, identified defendant as the perpetrator, Mr. Harris was shown the line-up again. He then identified defendant's photograph. Interestingly, however, both Mr. Harris and Mr. Munn, as well as a third eyewitness, Jeffrey Rock, who all claimed to have had a good look at the perpetrator's face, said he was cleanshaven. Defendant, however, not only had a mustache at the time, but it was a Fu Manchu mustache which, from his photograph taken the day after the murder, appeared to be quite distinctive. The third eyewitness, Mr. Rock, could not identify defendant from the line-up at all.[2]
Moreover, the identification of defendant's two-door, white Pontiac Sunbird as the vehicle used in the shooting was not without substantial question. The vehicle that all three witnesses identified initially was a four-door, white Chevrolet Cavalier. Indeed, the day after the killing a vehicle matching that description was discovered in the area. Hure Benson, the owner of that vehicle, a seemingly impartial individual, told the jury that that vehicle had been stolen from his home not far from where the murder occurred on the night of the murder and was recovered the following day. The police conducted no investigation, however, of this vehicle.[3]
*559 Finally, there was what for all appearances was a totally impartial fourth eyewitness, Inez Houston, who went to the police the day after the shooting. She gave a description of the perpetrator that was completely different from that of Harris and Munn. She was shown the same line-up previously shown to Harris and Munn and told the police the perpetrator was not in it. She adamantly testified in court that defendant was not the killer, and that his two-door Pontiac was not the vehicle that was used. That vehicle, she said, was a four-door white Chevrolet Cavalier, similar to the vehicle initially described by Harris and Munn and similar to Benson's vehicle.
In assessing the eyewitness evidence and observing the various deficiencies in it, we are not unmindful of the discovery of glass in defendant's vehicle when it was found the day after the incident, presumably from a broken window. According to the State's expert, and based upon laboratory analysis of that glass and glass found at the scene of the murder, as well as some information received from the FBI, unsuccessfully objected to by counsel as not contained in the expert's report, there was more than a ninety-nine percent chance that the glass found at the scene came from defendant's car. However, although the eyewitnesses saw bottles being thrown at the car just prior to the shooting, none of them hit any of the windows or broke any of them. According to defendant's testimony, and consistent with the presence of a brick found inside the rear of the car along with the glass, the window was broken at the time the car was stolen from the Seven-Eleven where defendant said he had left it after locking his keys in it.
We do not point out these weaknesses to suggest any merit to defendant's pro se claim that the verdict was against the weight of the evidence. We do so only to emphasize the weaknesses of the State's evidence of guilt insofar as those weaknesses bear upon the harm that any trial error could cause. This was, after all, primarily an issue of credibility, for there was little corroborative evidence of the witnesses' identification and not only defendant's denial, but substantial alibi evidence as well. E.g. State v. W.L., *560 278 N.J. Super. 295, 301, 650 A.2d 1035 (App.Div. 1995) ("[t]he question of defendant's guilt was, at best, exceedingly close. It is, therefore, clear that any error that could have appreciably tipped the credibility scale would have to be regarded as plain error having the capacity to have affected the outcome of the trial.").
And that takes us to defendant's alibi. The murder occurred at 8 p.m. Defendant said he left his home at 7:30 p.m., drove to a Seven-Eleven not far from the killing, arriving there around 7:55. When he got out of his car, he inadvertently locked the keys inside. He asked the Seven-Eleven owner if he had a coathanger. When that effort was unsuccessful, he walked the 15 or 20 minute distance to where his wife was working at the Mercer County Detention Center because she had an extra set of keys. There were two other employees on duty, both saw him on that evening and both testified that he came in between 8:15 and 8:30 and left shortly thereafter. Defendant returned to the Seven-Eleven to discover his car gone and broken glass on the ground where it had been parked. Thinking that it had been stolen, he called his wife from a pay phone. She told him to go home, obtain the insurance papers and call the police. He arrived home at 9:00 p.m. and made three calls to the three surrounding police stations, Hamilton, Ewing and Trenton. All three phone calls were recorded on the police station tapes and played to the jury. Defendant was told to report the theft in person and at 9:30 p.m. he went to the Trenton Police Station. They took his photograph and thence, according to defendant, began the nightmare.
In addition to his testimony, he presented the testimony of his wife, her two co-workers and the owner of the Seven-Eleven. It was defendant, as well, who presented the owner of the four-door white Cavalier, Hure Benson, and the fourth eyewitness, Inez Houston. To be sure, the testimony of all of these witnesses, as well as defendant, may well have been considered by the jury to have been no better than that of the State's witnesses. Indeed, a reading of the entire transcript leaves one with a sense of unease with any of the evidence.
*561 But this only, to our view, heightens the error that we think occurred with the admission of Robin Austell's hearsay "statement," if statement it was. And we say this because of all the evidence the jury heard as to the happening of the crime, her's was the only evidence that was heard without her appearance for cross-examination and any sense of who she was or how she fit into the picture. According to Tracy Edwards, who might be viewed either as an old friend of defendant's or as a jail-house stoolie who got himself a terrific deal on his pending second degree charge in return for his story (or both), Robin was defendant's girlfriend. Unknown to the jury, she was also a relative of a cousin of Edwards' attorney. It was that attorney who appeared on her behalf at the Trenton police station while she was giving a statement shortly after the shooting.[4] She later recanted and neither the statement nor she was presented to the jury. The State, however, was able to present to the jury the full flavor of what it contended was its inculpatory content through the Edwards testimony, strengthened by the admission of "rebuttal" evidence of the detective who took her statement that in fact she had given a statement.
Here is what Edwards told the jury. During December 1989 and January 1990, he and defendant, whom he had known for 17 years, were both in the Mercer County Detention Center. Although he admitted he already knew, he asked defendant why he *562 was in jail. Defendant told him that it was for killing a man on Hoffman Avenue.[5] According to Edwards, defendant told him the police had "picked him and his girlfriend up, and his girlfriend had told them everything." Further elaborating, Edwards stated
I said, well, what she told the police, told what happened, that I had shot him, and I asked him was it true, and he said, well, she going to change her statement, just like that, my lawyer going down there with her and she going to change her statement around.... She going to say that they scared her, she didn't know what she was doing, they threatened to take her kids away from her.
The State argued to the jury and contends here that the reference to Robin's "telling everything to the police, that I did it," constitutes an admission inculpating defendant and which defendant adopted in his alleged responses to Edwards' inquiries. And it says this is clearly reflected by what defendant allegedly also confessed to Edwards  that he killed the victim with a .22 handgun but had not meant to and that it was an accident.
The issue we must concern ourselves with is whether the included hearsay was properly admitted as an adoptive admission pursuant to Evid.R. 63(8)(b) (now N.J.E.R. 803(b)(2)). We think the beginning and end of that concern is the trial judge's observation that "Briggs has said Robin told them everything, and that's a judgment call on his part on what telling him everything is. And again, you could talk about what does that mean. It's very ambiguous, really."
The extreme caution that must be exercised when dealing with a hearsay statement as an adoptive admission has long been recognized. Greenberg v. Stanley, 30 N.J. 485, 498, 153 A.2d 833 (1959). See also, Burbridge v. Paschal, 239 N.J. Super. 139, 154-55, 570 A.2d 1250 (App.Div.), certif. denied, 122 N.J. 360, 585 A.2d 369 (1990). Critical to such admission is the requirement *563 that the defendant disclose, or be made aware of, the content of that which he is allegedly admitting to. Greenberg, supra, 30 N.J. at 498, 153 A.2d 833. Moreover, it must be clear that the defendant "understood and unambiguously assented" to the statement. United States v. Beckham, 968 F.2d 47, 52 (D.C. Cir.1992); United States v. Coppola, 526 F.2d 764, 769 n. 2 (10th Cir.1975); Commonwealth v. MacKenzie, 413 Mass. 498, 597 N.E.2d 1037, 1042-44 (1992) ("[e]vidence of [adoptive admissions] is to be received with caution, especially in criminal cases, due to the fact that the meaning of a defendant's response, or lack thereof, to an accusatory statement is often ambiguous.").
Here the actual content of the statement was never disclosed. The State contends the included statement was that defendant shot the victim and that was what Robin was going to recant. But that is hardly the same as "telling everything." Edwards' further testimony that "I said, well, what she told the police, told what happened, that I shot him...." is less than clear in terms of who told who what. The same can be said for the reference to "my lawyer going down there with her...." Contextually, the reference is to Edwards' lawyer, but it could just as well refer to defendant's lawyer. Moreover, assuming that it could be inferred that Robin told the police that defendant shot the victim, defendant's response when asked if it was true that Robin was going to change her story is hardly an expression of admission or belief in its truth.
Relying upon State v. Thompson, 59 N.J. 396, 283 A.2d 513 (1971), the State argues that defendant's additional, own alleged admissions may be ingrafted upon Robin's statement to not only give it the missing contents but establish its unambiguous adoption as well. Defendant in Thompson was charged with murder. He did not testify. A critical part of the State's case was a telephone conversation he had with his sister-in-law shortly after he had been identified in the newspapers as the murder suspect. During the conversation, defendant asked her if she had seen the paper. She said "I hope to tell you I saw the paper ..." and *564 asked "[y]ou didn't do that, did you...."? His response was "[n]o comment." She explained the contents of the article and said that it had a picture of defendant and reported that the police were looking for him as a suspect. During the telephone conversation, when she asked him why he did not just hit the victim instead of killing her, he replied "[w]ell, it's just one of those things." She also asked him if the police had any clues and his response was "no." She said "well, what about the pocketbook" and he said "Unh-Unh, no good." When she said "what about the mace," his reply was "unh-unh, very little effect." Obviously the references to the details of the murder were from the newspaper article.
Defendant argued that that information was included hearsay and that his responses were evasive, at best, and could not be considered to have adopted or expressed agreement with that information. In rejecting this contention, the Court noted that defendant's responses to the sister-in-law's questions gave the information "legitimate life as evidence" because "[o]verall his answers or comments revealed a personal knowledge of events associated with the murder, and constituted either actual or inferential admissions or declarations against interest with respect to its commission by him....", 59 N.J. at 408, 283 A.2d 513, and said:
The ... conversation between Thompson and his sister-in-law, whether considered in its entirety or in its individual parts, clearly bespeaks an adoption by him of her references to the crime as factual. Moreover, his answers and comments thereon in context indicate the kind of acknowledgment of their truth that would justify a jury in finding that they would be made only by the perpetrator of the crime....
[59 N.J. at 409-410, 283 A.2d 513].
The point is, the substance of the included hearsay in Thompson was clearly disclosed during the conversation and defendant's responses directed to that disclosure plainly reflected acceptance of the included information. Thus, while it is true that "the total exchange" must be considered, 59 N.J. at 410, 283 A.2d 513, the critical question is, total exchange as to what? Here, it is the admission of Robin's statement, not defendant's own alleged separate inculpatory statements, that is at issue. Though included in *565 the same conversation, they are distinct and unlike the integrated sister-in-law's news report references in Thompson. We do not think the context of defendant's own alleged admissions, under the particular circumstances here, can breathe life into the included statement. Had Edwards' testimony been that defendant had said "Robin told everything and that everything was that I killed him and I used a .22 handgun," clearly the additional details would then have been supplied through the remainder of defendant's own statement and his own admissions would have provided unambiguous assent. But that was not the testimony.
We add that even if the prior statement were admissible, defendant should have had the opportunity to fully flesh out the existence of the dual representation of Robin and Edward by the same attorney.[6]See Johnson v. Malnati, 110 N.J. Super. 277, 281, 265 A.2d 394 (App.Div. 1970). We acknowledge that trial counsel did not so request following the attorney's Rule 8 testimony. But we take note of defendant's pro se assertion that he was not present at the Rule 8 hearing and was not aware of the attorney's testimony until after the trial.
We conclude that admission of the included hearsay was error and because of the weaknesses in the evidence was such as to have "appreciably tipped the credibility scale...." State v. W.L., supra, 278 N.J. Super. at 301, 650 A.2d 1035. Moreover, because the improper admission of hearsay evidence implicates the confrontation clause, we consider whether it was "harmless beyond a reasonable doubt". Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). We do not think so. Clearly, the statement was a critical piece of evidence to the State and was not cumulative  there is no other evidence establishing the alleged Robin police statement. As we have said, *566 because of its ambiguous nature, the State was able to argue that it was inculpatory. There was, obviously, no ability to cross-examine on it other than through Edwards and the ability to cross-examine on a statement that someone "told everything" is limited at best. Finally, as we have noted, the evidence of guilt was anything but overwhelming. Cf. State v. Bankston, 63 N.J. 263, 272-73, 307 A.2d 65 (1973).
Reversed and remanded for a new trial consistent with this opinion.
NOTES
[1] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[2] Although Mr. Rock did identify defendant in court, it is clear that his ability to do so was the product of defense counsel's investigator showing him a photograph of defendant prior to trial. One may well question the strategy of that maneuver, or the admission of the obviously tainted in-court identification, albeit tainted by counsel's own doing.
[3] After Mr. Benson testified, the State presented a police report indicating his vehicle was stolen almost a year before the shooting. The theory was that Benson was mistaken as to the timing of the theft of his car. But the fact remains, it was indeed found by the police the day after the shooting and returned to Benson as a stolen vehicle. Moreover, at the least, the rebuttal report should have been presented to Benson during his testimony so that the jury could have had the benefit of his response. See Evid.R. 22(b) (now N.J.E.R. 613(b)).
[4] When it was disclosed that the same attorney who appeared at the police station on behalf of Robin also represented Edwards and was instrumental in the disclosure of defendant's alleged "jail-house confession"  much to the advantage of Edwards  the trial judge expressed a concern over an appearance of a conflict of interest. A Rule 8 hearing was conducted at which the attorney testified as to his role in Robin's statement and Edwards' disclosure. He said his involvement was minimal and denied knowing of the contents of either. The record, however, suggests that he may indeed have read Robin's statement. Moreover Edwards' testimony can be interpreted as indicating that Edwards discussed with the attorney what Edwards had to tell the prosecutor. In any event, the trial judge determined no further inquiry into the relationship was necessary. Neither the prosecutor nor defense counsel objected or expressed a different view.
[5] On cross-examination, it was brought out that Edwards initiated the conversation with defendant by asking him "if he was down here for the body on Hoffman Avenue and he said yes, and I asked him if they had anything on [him] ..." Edwards knew about the "body on Hoffman" from rumors in the law library at Mercer County Detention Center.
[6] We are aware that Edwards told the jury who his attorney was and the detective also told the jury who Robin's attorney was. The evidence as to this was isolated and fleeting. The potential significance of the dual representation, or even that there was dual representation, was plainly lost on the jury.