# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1221-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

A.O.F.,

    Defendant-Appellant.

_____

Submitted January 21, 2020 – Decided May 4, 2020

Before Judges Messano, Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 15-04-0224.

Joseph E. Krakora, Public Defender, attorney for appellant (Janet Anne Allegro, Designated Counsel, on the briefs).

James L. Pfeiffer, Acting Warren County Prosecutor, attorney for respondent (Kelly A. Shelton, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a bench trial, the court convicted defendant A.O.F. of two counts of aggravated sexual assault of a child under thirteen, N.J.S.A. 2C:14-2(a)(1); two counts of aggravated sexual assault of a related child between thirteen and sixteen, N.J.S.A. 2C:14-2(a)(2)(a); two counts of second-degree sexual assault of a child between thirteen and sixteen, with an actor four years older, N.J.S.A. 2C:14-2(c)(4); and third-degree endangering the welfare of child, N.J.S.A. 2C:24-4(a). The charges arose out of defendant's continual assaults of his niece, B.D. (Beth), over more than three years.[1] We are constrained to agree with defendant's contentions on appeal that the trial judge erred by admitting and then misapplying fresh complaint testimony; and in relying on Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony, ruled inadmissible in State v. J.L.G., 234 N.J. 265, 272 (2018). Therefore, we reverse defendant's conviction and remand for a new trial.

## I.

The State presented its case primarily through Beth's testimony. Her allegations were unsupported by any eyewitness testimony or corroborating physical evidence. The State bolstered Beth's testimony with that of two fresh

---

[1] In accord with Rule 1:38-3(c)(9), we use initials and pseudonyms for the reader's convenience.

complaint witnesses – each described Beth's disclosures roughly three and six years, respectively, after the last assault – and Beth's mother, her grandmother, and police officers, who described Beth's demeanor when she disclosed the assaults to them in 2014. The State also presented a Child Sex Abuse Accommodation Syndrome expert, who described behaviors he opined were typical of child victims of sexual assault.

Beth testified that defendant, then in his late thirties and her uncle by marriage, began assaulting her in July 2005, two months shy of her eleventh birthday. She said defendant engaged in sex acts with her at least three times a week for over three years.[2] These assaults included mostly penal-vaginal intercourse, but also digital-vaginal penetration, fellatio, cunnilingus, and anal penetration.

Beth's testimony at trial focused on the first-degree assaults, including the first two times defendant assaulted her. In July 2005, Beth was with defendant and her aunt in their apartment. They lived in the center unit of a modest row home consisting of three side-by-side apartments, which defendant owned. Beth, her mother, and baby brother lived next-door. Their two apartments

---

[2] Although Beth occasionally testified that the assaults occurred over a four-year period, the dates she provided coincided with a three plus year period.

A-1221-17T1

shared a wall. After Beth's aunt went to bed leaving the two of them alone, defendant complimented Beth on her looks at a time when she was overweight, had few friends, and lacked self-esteem. He then began petting her, and soon pulled down her pants and underwear and engaged in penal-vaginal intercourse.

After the encounter ended, defendant told Beth that if she told anyone about what had just happened, she, her brother, and her mother would have to move out of the apartment, which would cause them great financial hardship, since defendant allowed Beth's mother, who received public rental assistance, to pay bills late, or not at all. Additionally, defendant implied Beth's aunt would have to move out as well. Beth testified this convinced her not to tell anyone.

The next night, once defendant and Beth were alone again in his apartment, defendant asked Beth if she wanted to be his girlfriend. She responded, "I guess so." Then, defendant forced her to perform fellatio on him. Beth could not breathe, so he stopped, and he then had penal-vaginal intercourse with her. Beth stated most of the assaults occurred in the first floor living room, after her aunt went upstairs to bed. Beth stated she remained quiet during the assaults at defendant's direction, to avoid stirring her aunt.

Beth also testified that shortly after her thirteenth birthday, defendant performed cunnilingus on her, despite the fact she was menstruating; he washed

the blood off his face and mustache; and then committed penal-vaginal intercourse. Beth also described an incident of digital-vaginal penetration, while he was helping her tidy up his van; and an incident of penal-vaginal intercourse in the backyard, where Beth kept pet rabbits. She also recounted that defendant, while drunk, once attempted to enter her second-floor bedroom window because she had a friend over and refused to see him. Beth's mother saw him outside, standing on an old washing machine, and told him to go home.

As set forth at an N.J.R.E. 104 hearing, Beth first disclosed the abuse to her high school boyfriend, J.W., in the summer of 2011 before her senior year, after he revealed to her that he had been sexually abused as a child. He recalled that she described three of the incidents she later described at trial – the first assault; the instance in the backyard; and the time defendant tried to enter her room. He testified that she was tearful and emotional as she related the assaults.

Beth's family physician testified that at a sick visit in summer 2014, Beth disclosed that she was feeling depressed. Responding to the physician's follow-up questions, and once assured of confidentiality, Beth disclosed that her uncle had sexually assaulted her. The physician noted that Beth was emotional as she did so. Beth did not share details as she had with J.W.

The trial judge allowed both J.W. and the physician to testify as fresh complaint witnesses. The judge found, "[t]he criteria for fresh complaint" were satisfied, as "the statements were disclosed to two natural confidantes, . . . there was no coercive questioning, and . . . an aura of intimidation existed." In particular, the court found that Beth disclosed within a reasonable time, notwithstanding she did so three and six years after the assaults ended. Citing State v. L.P., 352 N.J. Super. 369 (App. Div. 2002), the court found that Beth "did not disclose the abuse until after she was free from the aura of intimidation which [d]efendant cast by threatening to evict her and her family should she disclose." The court also relied on State v. R.E.B., 385 N.J. Super. 72 (App. Div. 2006), where we permitted evidence of a fresh complaint two years after the abuse.

Both fresh complaint witnesses testified consistently with their pre-trial testimony. Although J.W. did not describe the three incidents at trial, both witnesses described Beth's distraught or emotional state when she disclosed. Over objection, J.W. testified that Beth had difficulties with intimacy throughout their relationship. Beth told him she did not disclose the assaults because she thought no one would believe her. On cross-examination, J.W.

6

admitted that he and Beth borrowed defendant's pick-up truck to move her things, when she and J.W. began living together.

In fall 2014, when she was 20 years old, Beth informed her mother of the abuse during an argument, to explain why she sometimes acted the way she did. Her mother testified that she supported her daughter. After learning of the allegations, Beth's mother made arrangements to move to another apartment. Once Beth's mother and children moved out, Beth's grandmother confronted defendant with the allegations, which he denied. Outraged, Beth reported the assaults to the police. Police officers who interviewed Beth testified about her demeanor when she discussed the assaults.

Defendant was the sole defense witness. His wife had passed away before trial. He denied sexually assaulting Beth. He alleged that Beth's allegations were prompted by a "family vendetta" against his wife, who he said was considered the "black sheep" of the family. He maintained that he was working very long hours, and attending trade classes, during much of the period when Beth alleged the assaults occurred. So, he was rarely home before Beth's bedtime, and could not have committed the assaults.

He stated he was a supportive uncle who took an interest in all the children in his wife's extended family. He admitted that he and Beth sometimes watched

television together and went grocery shopping, and he attended her school events. Addressing the incident outside Beth's bedroom window, he explained that Beth and her friend had mischievously run into his apartment and turned off his television. Unable to enter the front door of their apartment, he went around the back, to try to scold the children. He admitted he had been drinking.

On cross-examination, the State elicited inconsistencies between his custodial statement to police after his arrest, and his trial testimony, in which he seemed to downplay the closeness of his relationship with Beth. The State also elicited that defendant's wife drank alcohol throughout the day and also took prescription pain medicine, to counter the defense suggestion that she would have heard the sexual assaults.

In his extensive oral opinion, the trial judge reviewed the trial testimony and said the case presented a credibility contest of "he said/she said." The judge noted the State offered no eyewitnesses or physical evidence. The judge found Beth very credible, and defendant not so. In crediting Beth, the court noted her demeanor at trial. He found it "logical" that defendant preyed on Beth when she was young, lacked friends and self-esteem, and was vulnerable to exploitation. He also found Beth's testimony was "corroborated" by her prior consistent

statements, as well as the fresh complaint witnesses' testimony. The judge also gave some weight to the CSAAS testimony.

The court found that defendant's inconsistent statements, and his effort to minimize his relationship with Beth, undermined his credibility. The court rejected his contention that a "family vendetta" motivated Beth to falsely accuse him of assault.

The judge sentenced defendant to an aggregate term of twenty years, with a seventeen-year period of parole ineligibility under the No Early Release Act (NERA) N.J.S.A. 2C:43-7.2. The court imposed concurrent twenty-year terms, subject to NERA on the four first-degree counts; concurrent seven-year terms on the two second-degree counts; and a concurrent four-year term on the third-degree count. The court imposed parole supervision for life, and Megan's Law requirements. The court also entered a permanent Nicole's Law restraining order.

Defendant raises the following points for our consideration:

POINT I

THE COURT IMPROPERLY ADMITTED FRESH COMPLAINT TESTIMONY OF TWO WITNESSES, DEPRIVING DEFENDANT OF A FAIR TRIAL AND WARRANTING REVERSAL.

A. BETH's COMPLAINTS OF SEXUAL ASSAULT WERE NOT MADE WITHIN A REASONABLE TIME TO BE ADMISSIBLE AS FRESH-COMPLAINTS.

B. THE TRIAL COURT ERRED BY ADMITTING DUPLICATIVE FRESH-COMPLAINT TESTIMONY.

C. THE COURT ERRED IN ADMITTING THE FRESH-COMPLAINT TESTIMONY SINCE THE EXCESSIVE DETAILS PROVIDED WENT BEYOND THE LIMITED PURPOSE OF THE RULE.

POINT II

THE COURT VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL BY ADMITTING TESTIMONY AS TO THE ALLEGED CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME.

A. CSAAS IS NOT SUPPORTED BY GENERALLY SCIENTIFIC RESEARCH.

B. CSAAS FAILS UNDER N.J.R.E. 702 SCRUTINY.

C. CSAAS DOES NOT APPLY TO THE PARTICULAR FACTS OF THIS CASE.

POINT III

THE TRIAL COURT ERRED BY NOT GRANTING DEFENDANT'S MOTION TO DISMISS AFTER THE STATE RESTED ITS CASE.

POINT IV

10 A-1221-17T1

THE COURT'S CREDIBILITY DETERMINATION
WAS NOT SUPPORTED BY SUFFICIENT
CREDIBLE EVIDENCE IN THE RECORD AND
MUST BE REVERSED SINCE THE COURT SAT AS
THE TRIER OF FACT IN THIS MATTER.

POINT V

THE SENTENCE IMPOSED BY THE COURT WAS
EXCESSIVE.

In his reply brief, defendant contended that the Supreme Court's decision in J.L.G. should apply retroactively to his case.

Only the issues pertaining to CSAAS and fresh complaint testimony warrant extended discussion. We address those in turn.

II.

In J.L.G., 234 N.J. at 272, the Court held that "expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials." Those alleged behaviors are secrecy, helplessness, accommodation, delayed disclosure, and retractions. Id. at 282-83. Although expert testimony about delayed disclosure may be admissible at trial, such evidence must conform with the requirements of N.J.R.E. 702. Id. at 272. "In particular, the State must show that the evidence is beyond the understanding of the average juror," which is a fact-specific inquiry. Ibid. Therefore, the Court found, "because the victim gave

11

straightforward reasons about why she delayed reporting abuse, the jury did not need help from an expert to evaluate her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid.

In State v. G.E.P., 458 N.J. Super. 436, 443 (App. Div.), certif. granted, 239 N.J. 598 (2019), we "accord[ed] J.L.G. pipeline retroactivity," thereby applying it both to prospective cases and "pending cases where the parties have not yet exhausted all avenues of direct review." Id. at 445 (quoting State v. Burstein, 85 N.J. 394, 402-03 (1981)).

As defendant had not yet "exhausted all avenues of direct review," we apply J.L.G. to his case and conclude that it was plain error for the court to admit CSAAS testimony. The CSAAS testimony at trial addressed all five aspects of the "syndrome," including delayed disclosure. Even as to delayed disclosure, expert testimony was unnecessary, as Beth provided a plausible explanation for her delay, which was not beyond the ken of the fact-finder. See N. J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 439 (App. Div. 2002) (stating that the principles under N.J.R.E. 702 governing admissibility of expert evidence in a jury trial apply equally to a bench trial). As noted, Beth testified that she did not reveal the abuse until her disclosure to J.W. in August 2011

because she feared defendant would evict or otherwise punish her family and her aunt, who depended on defendant financially. Notably, even when she disclosed to J.W. and her physician, she made sure they would keep that information confidential. She also testified that she did not think anyone would believe her.

No CSAAS expert was needed to explain Beth's delay. See J.L.G., 234 N.J. at 273-74 (CSAAS testimony regarding delay not admissible where victim said defendant pointed gun at her, and "threatened to hurt her, her mother, or her brother if word got out"); G.E.P., 458 N.J. Super. at 455-56 (in companion case to G.E.P., CSAAS testimony not admissible where victim delayed disclosure because she was "frightened," and thought something bad would happen to her mother or family members if she reported abuse); Id. at 458 (in companion case to G.E.P., CSAAS testimony not admissible where defendant told victim that if she told anyone she would not be able to see him anymore, which she interpreted as not being able to also see her mother or brother).

The trial court placed some weight, albeit not "great weight" on the CSAAS testimony. In its decision, the court recognized that "CSAAS testimony is not meant to be probative at all" and "it could be argued that presentation of this type of expert testimony could unduly . . . prejudice the defendant or may

confuse a jury," but the court concluded those concerns were "not present" in a bench trial. Nonetheless, after referring to the CSAAS expert's testimony, the court found evidence of secrecy, helplessness and accommodation – three behaviors that are no longer admissible subjects of expert testimony. The judge stated,

> [T]he [c]ourt took note that several of the factors are present, particularly that [Beth] kept the abuse a <u>secret</u>, felt <u>helpless</u> in attempting to preserve the family and protect her mother, and even the defendant, and her aunt from financial consequences, and that there was, perhaps, <u>accommodation</u> that he became her boyfriend and she thought of it as a relationship after the initial events . . . .
>
> [(Emphasis added).]

Although the judge went on to say he "did not place great weight on the CSAAS testimony," and he "placed more weight on the testimony of the victim and the defendant and their credibility determinations," the judge implied he placed some weight on the CSAAS testimony. That reliance may have been critical to the ultimate verdict in what the judge described as a "he said/she said" credibility contest. As we noted in <u>G.E.P.</u>, 458 N.J. Super. at 449, reversing the conviction, "the corroboration of the victim's testimony . . . was far less than in <u>J.L.G.</u>," where the State presented a recording of the assault.

We therefore conclude that the admission of the CSAAS testimony and the court's reliance on it constitutes plain error, by "rais[ing] a doubt as to the validity of the . . . verdict." G.E.P., 458 N.J. Super. at 448 (citing State v. Daniels, 182 N.J. 80, 95 (2004)).[3] In other words, it is an error "of sufficient magnitude to raise a reasonable doubt as to whether it led the [court, sitting without a jury] to a result it would otherwise not have reached." State v. Weston, 222 N.J. 277, 294 (2015) (quoting Pressler & Verniero, N.J. Court Rules, cmt. 2.1 on R. 2:10-2 (2015)).

As we held when CSAAS testimony was misused in a case involving a close credibility contest, "[i]t is . . . clear that any error that could have appreciably tipped the credibility scale would have to be regarded as plain error having the capacity to have affected the outcome of the trial." State v. W.L., 278 N.J. Super. 295, 301 (App Div. 1995). That is so here. Therefore, the admission of CSAAS testimony warrants reversal.

III.

---

[3] Given our conclusion, we need not decide whether it is appropriate even to apply the more demanding plain error standard in a case where the Court has post-trial adopted a new rule of law that trial counsel may not reasonably have anticipated. See G.E.P., 458 N.J. Super. at 448 (noting, but declining to decide the same issue).

15

The court also erred by allowing Beth's physician to testify as a fresh complaint witness – as Beth's complaint to the physician was not fresh by any measure, and the testimony was cumulative – and by misusing both fresh complaint witnesses' testimony to corroborate Beth's trial testimony.

Well-settled principles govern our analysis. The fresh complaint doctrine allows "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015); see also State v. Hill, 121 N.J. 150, 163 (1990) (noting that "fresh-complaint evidence serves a narrow purpose . . . [to] allow[] the State to negate the inference that the victim was not sexually assaulted because of her silence").

Consistent with that limited purpose, "the fresh complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'" R.K., 220 N.J. at 456 (quoting State v. Bethune, 121 N.J. 137, 146 (1990)). A jury, or a court sitting without a jury, may not consider fresh-complaint testimony "as substantive evidence of guilt, or as bolstering the credibility of the victim; it may only be considered for the limited purpose of confirming that a complaint was made." Ibid. For that reason, the testimony must exclude details of the assault that the complaint may have conveyed. "Only the facts that are

minimally necessary to identify the subject matter of the complaint should be admitted." Ibid. Also, given the testimony's "narrow purpose of negating inferences that the victim had failed to complain," a trial court must "assess . . . whether repeated testimony of the victim's complaint is irrelevant or prejudicial to the defendant." Hill, 121 N.J. at 169.

"[T]o qualify as fresh complaint, the victim's statements to someone she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." Hill, 121 N.J. at 163. The "reasonable time" requirement has been relaxed where the complainant is a child, "'in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them.'" State v. W.B., 205 N.J. 588, 618 (2011) (quoting State v. P.H., 178 N.J. 378, 393 (2004)); see also R.E.B., 385 N.J. Super. at 88 (stating two-year gap between abuse and fresh complaint permissible, especially where neither party contended the complaint did not satisfy fresh complaint components); State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003) (stating "even a substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint"); L.P., 352 N.J. Super. at 383 (permitting roughly

17

year-long delay after adoptive father ceased abuse, where father threatened to kill the child, and the child then lived in foster home with father's biological daughter who physically abused her, and child disclosed several weeks after leaving the foster home); State v. Hummel, 132 N.J. Super. 412 (App. Div. 1975) (allowing fresh complaint testimony three years after repeated assaults began, but just a few weeks after child left the foster home where she lived with the abuser, and victim also confided in a fellow victim shortly after the assaults began). The W.B. Court also cited approvingly to a Massachusetts decision finding a "two-year delay reasonable where [the] first disclosure was to [her] boyfriend when he tried to kiss [the] victim and she had been fearful of disrupting [the] home where she and [the] defendant continued to live." W.B., 205 N.J. at 619 (citing Commonwealth v. Hyatt, 579 N.E.2d 1365, 1367-68 (Mass. 1991)).

Applying these principles, we are convinced the court abused its discretion in admitting the physician's testimony. See L.P., 352 N.J. Super. at 380-81 (stating admissibility of fresh complaint testimony left to trial court's discretion). We focus on the doctrine's "reasonable time" requirement.[4]

_____

[4] We do not question the spontaneity or voluntariness of Beth's complaints. "The spontaneity prong merely requires that the complaint not be the result of

18

Although the court's decision to admit J.W.'s testimony is questionable, as the three-year delay puts the disclosure at the outer limit of what our courts have deemed a "reasonable time," the six-year delay between when the alleged assaults stopped and Beth complained to the physician far exceeds that.[5] See Pillar, 359 N.J. Super. at 285 (court erred admitting a "fresh" complaint six years after the abuse).

In permitting the fresh complaint testimony, notwithstanding the complaint was anything but fresh, the court relied on an "aura of intimidation" that deterred Beth's complaint. Yet, this case is unlike in L.P., where the intimidation lifted when the victim left the foster home, freeing her to disclose the assaults several weeks later. L.P., 352 N.J. Super. at 384-85. Here, the retaliation threat continued unabated. Until shortly before defendant's arrest, he remained Beth's mother's landlord who, Beth feared, could inflict financial

---

coercive interrogation." W.B., 205 N.J. at 617 (citing Bethune, 121 N.J. at 145). Here, Beth's complaints to both J.W. and the physician were uncoerced. She disclosed to J.W. in response to his own confession, and she invited her physician's inquiries by disclosing feelings of depression.

[5] We recognize that some courts have jettisoned the "reasonable time" requirement entirely. People v. Brown, 883 P.2d 949, 950 (Cal. 1994). However, our Court has not done so, see, e.g. R.K., 220 N.J. at 455 (reciting the "reasonable time" requirement), although the Court has endorsed flexibility in children's cases, W.B., 205 N.J. at 618.

hardship.[6] Fear of retaliation certainly may explain a victim's silence. But, unabated fear does not explain why a victim like Beth would break her silence. Nor does it justify admitting the physician's testimony of Beth's report six years after the assaults stopped. The Supreme Court has recognized that under some "factual circumstances . . . the child's disclosure is delayed sufficiently that there is no fresh complaint." P.H., 178 N.J. at 393. This is such a case, at least with respect to the physician's testimony.

Furthermore, the physician's testimony was cumulative. To the extent the State wished to negate the inference drawn from the "timing myth" – "the mistaken perception that a victim will report a sexual assault immediately," id. at 392 – J.W.'s testimony sufficed. Evidence of the second disclosure added little to negate the inference – especially since it occurred three years after the first one. Rather, it inappropriately served to bolster Beth's trial testimony, by providing evidence of Beth's prior consistent statement, and her demeanor when she delivered it. In short, "repeated testimony of the victim's complaint [was] irrelevant [and] prejudicial to the defendant." Hill, 121 N.J. at 169.

---

[6] In his decision allowing the fresh complaint testimony, the trial judge also mistakenly stated "[d]efendant in this case moved out of the home three years before the victim first disclosed abuse." The record clearly established that defendant remained in his apartment until his arrest. Beth moved out in 2012, to live with J.W. Beth's mother moved out after Beth disclosed to her.

Unlike when we review a jury trial, we need not speculate in this case whether the fact-finder misused the fresh complaint testimony. The trial judge expressly stated that he used J.W.'s and the physician's testimony to corroborate Beth's trial testimony. The judge stated, "[Beth] showed those flashes of anger when she had to answer questions about the particularities of the abuse. Her testimony was consistent with earlier statements made and corroborated by testimony of – and consistent with the testimony of the [f]resh [c]omplaint witnesses."

That was error. "The testimony did more than rebut a charge of fabrication based on silence." R.K., 220 N.J. at 460. The court used it to corroborate Beth's testimony, and to bolster her credibility. As we have noted, that is an impermissible use of fresh complaint testimony, which otherwise would be barred by the hearsay rule. R.K., 220 N.J. at 455.[7] Furthermore, in light of the

_____

[7] The State does not argue that Beth's complaints were admissible as prior consistent statements to support her credibility, see N.J.R.E. 607 (stating "[a] prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence"), or to establish the truth of the matters asserted in those prior statements, see N.J.R.E. 803(a)(2) (stating that the hearsay rule does not apply to statements made by a trial witness, which "would have been admissible if made by the declarant while testifying and the statement . . . is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive").

court's statement, we cannot be confident that the court did not consider the details of the assault that J.W. shared in the N.J.R.E. 104 hearing. Lastly, "consistency alone does not constitute corroboration." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 523 (App. Div. 2017) (analyzing N.J.S.A. 9:6-8.46(a)(4)).

In R.K., the Supreme Court held it was reversible error to omit a limiting instruction and to permit a fresh complaint witness to provide excessive and prejudicial details. 220 N.J. at 460. The Court evidently presumed that the jury misused the testimony, absent appropriate instructions. Here, we are constrained to conclude that the court, sitting without a jury, misused the fresh complaint testimony as well, and denied defendant a fair trial.

IV.

Defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Finally, we are constrained to remand to a new fact-finder. Since "the trial court previously made credibility findings, we deem it appropriate that the matter be assigned to a different trial court." R.L. v. Voytac, 199 N.J. 285, 306 (2009); see also Matter of Guardianship of R., 155 N.J. Super. 186, 195 (App. Div. 1977) (remanding to a different trial judge, where "[t]he judge who heard

the matter below ha[d] already engaged in weighing the evidence and ha[d] rendered a conclusion on the credibility of the . . . witnesses.").

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION