**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Santos Renan ORELLANA–BLANCO,**
**Defendant–Appellant.**

**No. 01–10045.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 2001.

Filed June 26, 2002.

Jon M. Sands, Assistant Federal Public
Defender, Phoenix, AZ, for the appellant.

Joan G. Ruffennach, Assistant United States Attorney, Phoenix, AZ, for the appellee.

Before: BRUNETTI, KLEINFELD, and THOMAS, Circuit Judges.

KLEINFELD, Circuit Judge.

This criminal case requires application of the hearsay rule and the confrontation clause to a law enforcement memorandum of an interview.

### Facts

Appellant Santos Orellana–Blanco was convicted after a jury trial of marriage fraud [1] and making a false statement on an immigration document.[2] The theory of the prosecution's case was that he fraudulently married a woman, Beatrice Boehm, to evade restrictions in the immigration laws, and that he lied in his sworn statement and other papers by stating that he was married to her and lived with her when the marriage was actually a sham.

The government didn't charge Boehm, Orellana–Blanco's putative wife. Instead it used her as its star witness against him. She testified that the marriage was, as charged, a sham, and was intended as such by both of them from the beginning. Orellana–Blanco testified that he fully intended to live with Boehm as husband and wife when he married her, did so to the maximum extent that she would allow, and was ultimately frustrated in his attempt to live with her by her leaving him and taking a job elsewhere after cancer surgery made him impotent. At least one of these people was lying, and the jury was not too enthused about Boehm. It sent out a note during deliberations asking "Why wasn't Bobby [Beatrice Boehm] charged with fraud concerning her part in falsifying the records?"

This appeal challenges admission of an exhibit that the government used to prove Orellana–Blanco lied under oath about his marriage. The exhibit purports to be a "Record of Sworn Statement" signed by Orellana–Blanco, in connection with a "Form I–130, Petition For Alien Relative." In the document Orellana–Blanco says he lives with his wife, he is married to her, they lived together before the marriage at the same address (his wife's house), and they've lived together continuously since the marriage. Orellana–Blanco's own testimony at trial established that he had not lived continuously or at all with Boehm, in the sense of regularly sleeping in the same residence. Therefore if the exhibit came in, as it did, then his conviction was nearly assured, at least on the false statement count, and his credibility was severely undercut on the sham marriage count.

Orellana–Blanco came illegally to the United States in 1990 from El Salvador. He worked regularly, making fast food for a chain restaurant, painting airplane parts, and doing other jobs. His membership in a class protected under an injunction in an unrelated civil class action suit kept him from being deported.

In 1994, Orellana–Blanco married Beatrice Boehm at the county courthouse in Prescott, Arizona. Boehm testified that she agreed to marry him, without ever having seen him before, to help legalize him and because Orellana–Blanco's brother and sister-in-law agreed to paint her truck, which she could not otherwise afford. She testified that they met in the car on the way to the ceremony, got married (with a borrowed ring), and had din-

---

1. 8 U.S.C. § 1325(c).

2. 18 U.S.C. § 1546(a).

ner with the brother and sister-in-law (the witnesses). Then Orellana–Blanco dropped her off, alone, at her house. She conceded that she wasn't paid money to marry Orellana–Blanco. She testified that they had agreed they would divorce in three years, and the reason they had not was that he refused because the immigration rules turned out to require five years, and she didn't have the money to hire a divorce lawyer.

Orellana–Blanco's and Boehm's testimony conflicted on the whole course of the relationship, including whether they had ever consummated the marriage or had any sexual relationship at all. He said he'd met Boehm years before the marriage, at his brother's house, and saw her frequently thereafter. Boehm said they met on the day of the wedding. Orellana–Blanco testified that before the marriage they did such things as watch movies and go to dinner together, he helped her clean her house, they drank together, she would tell him about her problems with her son, and they had sexual relations before marriage, sometimes outdoors, sometimes at her house after watching movies if Boehm's son wasn't there. She testified that none of this had happened, except that Orellana–Blanco had helped her clean her house and lay carpet, and had mowed her lawn once. She said she never had sexual relations with him before or after marriage.

Both also testified that they never lived together. Orellana–Blanco said Boehm wouldn't let him move in, because she was hiding the marriage from her son for the first year, and after that she was still uncomfortable because of her son and asked Orellana–Blanco "to give her some time." Boehm testified that the reason they never lived together was because the marriage was intended to be a sham.

They established a joint bank account, and Boehm filed tax returns as a married

person. They exchanged gifts. Orellana–Blanco also said he gave Boehm money for household expenses, which Boehm did not deny.

Three years after the marriage, Orellana–Blanco was hospitalized for surgery to remove a large cancerous tumor in his colon. The surgeon testified that he remembered talking to Boehm during this period and she was "appropriately concerned, as anybody would be if their close family member had a major operation." Boehm testified that she was at the hospital when Orellana–Blanco had his surgery and visited him once after he was released.

According to Orellana–Blanco, the marriage, such as it was, deteriorated when Boehm objected to his having withdrawn money from their joint account, although he had put money in. He testified that after his surgery, in which seventy percent of his stomach and intestine were removed, and his year of chemotherapy following it, he could no longer perform sexually, and that changed their relationship. Boehm moved to New Mexico for a new job living with a blind rancher and his senile wife and said she wanted a divorce.

The exhibit at issue, Exhibit 3, was generated in 1998, after the surgery but before Boehm moved to New Mexico. The INS interviewed Orellana–Blanco and Boehm as part of the process by which Orellana–Blanco hoped to receive his "green card," or permanent resident alien status. Boehm had already signed an I–130 Petition for Alien Relative on Orellana–Blanco's behalf, in which she swore they were married. An INS agent testified that "at a certain stage of the process, the husband and wife, in these cases, are brought in for separate interviews." Boehm and Orellana–Blanco drove together to Phoenix for their interview. Boehm testified that on their drive down to Phoenix, they agreed on what lies to tell, and,

she testified, she told them under oath in her separate interview. Her signed statement under oath was not introduced into evidence.

Orellana–Blanco was interviewed by INS Adjudications Officer Brett Kendall. But Officer Kendall did not testify at the trial. There was testimony that he was on leave and was living with his parents, but the government did not produce him as a witness. Instead it offered what purported to be a sworn statement by Orellana–Blanco, described above, through the testimony of another INS agent, Adjudications Officer Radke. But Officer Radke testified that he wasn't in the room for the whole interview. The reason he was in there at all was that Kendall called him in to translate from English to Spanish and Spanish to English, because Kendall felt that his own "knowledge of the Spanish language was not adequate to find out what he needed to find out." Officer Radke gave Orellana–Blanco the oath in Spanish, translated Officer Kendall's questions, and translated Orellana–Blanco's answers when given in Spanish (Orellana–Blanco gave some answers in each language). The interview was not taped. Orellana–Blanco testified that Radke used a Spanish English dictionary during the interview, but Radke testified that he didn't. Officer Radke testified that "[p]art way through the interview Officer Kendall was satisfied that the applicant could understand English, and at that point I did not participate in the interview anymore, other than to come in to witness the signature."

The form shows answers, apparently written by Officer Kendall, usually of just a word or two, such as "11/03/47 Victoria Texas" in answer to "What is your spouse's date and place of birth?" Because Kendall did not testify, and Radke was not there for the whole interview, there is no direct evidence on whether the answers were a verbatim record of what

Orellana–Blanco said, or Kendall's formulation of what he understood Orellana–Blanco to have said. Officer Radke conceded that the answers were not verbatim and would not reflect questions by Orellana–Blanco, such as his asking what a question meant. The statement is signed by Orellana–Blanco and witnessed by Officer Kendall and Officer Radke. Orellana–Blanco testified that he and the INS officers sometimes used Spanish, sometimes English, and "really we didn't quite understand each other." Officer Kendall wasn't called as a witness, so he didn't testify to the contrary, and Officer Radke wasn't at all of the interview. Officer Radke did not see Officer Kendall read the form with the answers back to Orellana Blanco, and testified that "generally it's not read." Although Orellana–Blanco testified that he signed the form, no one asked him whether he read it before he signed it, or whether it was read to him, and he denied giving some of the responses on the form, such as that he and Boehm had lived together continuously since marrying. A more senior INS official testified that each unit used different forms, and "the questions are different to each individual you're going to take a statement from," so there was no one standard form.

In addition to what purported to be Orellana–Blanco's answers, the exhibit showed what were apparently notations about the answers by Officer Kendall, who was not present at trial to be cross examined. Next to one answer, Officer Kendall had written "wrong," next to another that on his last visit to his parents Orellana–Blanco's wife did not accompany him Officer Kendall wrote and circled "alone," and Officer Kendall circled some other answers.

The district court allowed Exhibit 3 into evidence, over the objection of Orellana–Blanco's lawyer, during the testimony of

another INS agent who testified as a custodian of records that the form was in Orellana–Blanco's "A-file." Orellana–Blanco was convicted and sentenced to three years of probation, which he is now serving, and he timely appealed.

### Analysis

 This appeal challenges one thing, admission of this damning exhibit. The challenge is on both confrontation clause and hearsay grounds. We review claimed violations of the confrontation clause *de novo*,[3] a district court's construction of the hearsay rule *de novo*,[4] and a district court's decision to admit evidence under exceptions to the hearsay rule for abuse of discretion.[5] To avoid reversal for confrontation clause error, the government must demonstrate that the error was harmless beyond a reasonable doubt.[6]

The government concedes that it is unclear from the record upon which of its urged grounds the district court admitted the exhibit. The government first argues that the statement was not hearsay at all, but rather an admission under Federal Rule of Evidence 801(d)(2)(A).[7] Ordinarily a signed statement, even if written by another in another's words, would be adopted as the party's own if he signed it, because signing is a manifestation of adopting the statement.[8] Thus, a signed statement ordinarily would raise no serious hearsay or confrontation clause problem.[9]

 Here, though, the exhibit should not have come in as an admission, because the foundation was inadequate to demonstrate that Orellana–Blanco really did make the statements or adopt the statements in the exhibit as his own.[10] The rule on adoptive admissions requires that "the party has manifested an adoption,"[11] and in this case there was no district court finding to that effect. Even though a signature would ordinarily make adoption plain,[12] it does not in the circumstances of this case. The evidence established a considerable language barrier, and did not support an inference that the form was read to Orellana–Blanco with the answers, or that he read it, or that he could read it. Officer Radke, the translator, wasn't there for substantial portions of the interview, and couldn't testify to what went on when he wasn't there. The evidence did not support an inference that the form was a

---

3. *See Lilly v. Virginia,* 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

4. *See United States v. Pena–Gutierrez,* 222 F.3d 1080, 1086 n. 3 (9th Cir.2000).

5. *See United States v. Olafson,* 213 F.3d 435, 441 (9th Cir.2000).

6. *See Pena–Gutierrez,* 222 F.3d at 1086.

7. Fed.R.Evid. 801(d)(2)(A) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity. . . .").

8. *United States v. Felix–Jerez,* 667 F.2d 1297, 1299 (9th Cir.1982); *see also* Fed.R.Evid. 801(d)(2)(B) ("A statement is not hearsay if . . . [t]he statement is offered against a party

and is . . . a statement of which the party has manifested an adoption or belief in its truth. . . .").

9. *See Felix–Jerez,* 667 F.2d at 1299.

10. *See United States v. Monks,* 774 F.2d 945, 950 (9th Cir.1985) (before letting in evidence as an adoptive admission, "the district court must first find that sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement").

11. Fed.R.Evid. 801(d)(2)(B); *see also United States v. Gil,* 58 F.3d 1414, 1419–20 (9th Cir.1995); *Monks,* 774 F.2d at 950.

12. *See Felix–Jerez,* 667 F.2d at 1299.

verbatim record of what Orellana–Blanco said. As in *Gonzalez–Gomez v. INS,*[13] where we considered a signed affidavit under similar circumstances, "[t]he probative value of this document is severely undermined by the circumstances of its execution."[14]

The government next argues that the statement was admissible as a coconspirator statement under Federal Rule of Evidence 801(d)(2)(E).[15] The government's theory is that Orellana–Blanco conspired with Boehm. We can't make any sense of this argument. The statement did not purport to be by Boehm, the "coconspirator of a party" referred to in the evidence rule, but by Orellana–Blanco himself. Rule 801(d)(2)(E) is a device for getting someone else's statement into evidence against the defendant, not for getting the defendant's own statement in on the theory that he conspired with someone else.

▮ The government's next argument is that the exhibit was properly admitted under the business records exception, Fed-

eral Rule of Evidence 803(6).[16] As we held in *United States v. Pena–Gutierrez,*[17] regarding government agents' interview reports in criminal cases, "district courts should admit such law-enforcement reports, if at all, only under the public-records exception contained in Federal Rule of Evidence 803(8)."[18] That this interview might be used to grant a green card to a United States citizen's spouse, rather than to prosecute the alien for a crime, does not shift the case from the public records exception, 803(8), to the business records exception, 803(6), because the record was in fact being used for a criminal prosecution in this case. When public records are used against a defendant in a criminal prosecution, the public records exception is the exclusive applicable hearsay exception.[19] It is the exception that speaks directly to public records and carefully delineates the distinction between criminal and civil proceedings in order to protect a defendant's rights under the confrontation clause.[20]

13. 450 F.2d 103 (9th Cir.1971).

14. *Id.* at 105.

15. Fed.R.Evid. 801(d)(2)(E) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.").

16. Fed.R.Evid. 803(6) (excepting from exclusion by hearsay rule "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.").

17. 222 F.3d 1080 (9th Cir.2000).

18. *Id.* at 1086–87; *see also United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir.1980); *United States v. Orozco,* 590 F.2d 789, 793 (9th Cir.1979).

19. *Pena–Gutierrez,* 222 F.3d at 1086–87; Fed. R.Evid. 803(8) (excepting from exclusion by hearsay rule "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.").

20. *See McCormick's Handbook of the Law of Evidence* § 317, at 738 (Edward W. Cleary ed., 2d ed.1972).

■ The government next argues that the exhibit was admissible under the public records exception, Federal Rule of Evidence 803(8).[21] The Federal Rules of Evidence are, like many written laws, organic growths out of our common law. The exception developed to admit the sundry sorts of public documents for which no serious controversy ordinarily arises about their truth, and it would be a great waste of time to have the person who created them come to court and testify, such as birth certificates, death certificates, judgments, licenses, and the like.[22] Such a statement comes in under "a firmly rooted hearsay exception" and has adequate indicia of reliability so that confrontation of the clerk who wrote the statement is not needed for the confrontation clause.[23] We admit statements under a "firmly rooted" hearsay exception when they fall "within a hearsay category whose conditions have proved over time 'to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath' and cross-examination at a trial." [24]

The Federal Rule expressly makes an exclusion to the exception for police reports and the like: "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." [25] In criminal cases, the public records hearsay for which an exception to inadmissibility is made is limited to "records of routine, nonadversarial matters made in a nonadversarial setting," [26] reflecting "ministerial, objective observations." [27] It does not apply to the subjective observations, summaries, opinions and conclusions of law enforcement personnel.[28] An interview such as the one in the exhibit is adversarial in nature. Orellana–Blanco was separated from his wife, obviously so that they could not coordinate their stories as they told them, and put under oath. Numerous cases treat INS officers and agents as "law enforcement" personnel, which are covered by the exclusion to the hearsay exception.[29] Though the interview might not have been used for law enforcement purposes had the INS officer been satisfied, it was in fact used for that purpose, and in the natural course would be, if the INS was unsatisfied. Because Orellana–Blanco was put under oath and then charged with lying under oath on the form, the interview itself, at the INS office, was the "scene of the crime," and Officer Kendall's notes were in fact his

**21.** Fed.R.Evid. 803(8).

**22.** *See, e.g., McCormick's* § 315, at 736; *United States v. Hernandez–Herrera,* 273 F.3d 1213, 1217–18 (9th Cir.2001); *Hughes v. United States,* 953 F.2d 531, 539–40 (9th Cir. 1992); *United States v. Regner,* 677 F.2d 754, 762–63 (9th Cir.1982) (Ferguson, J. dissenting).

**23.** *Hernandez–Herrera,* 273 F.3d at 1218; *see also Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Contreras,* 63 F.3d 852, 857 (9th Cir.1995).

**24.** *Lilly,* 527 U.S. at 126, 119 S.Ct. 1887 (quoting *Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895));

*see also Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

**25.** Fed.R.Evid. 803(8)(B).

**26.** *United States v. Wilmer,* 799 F.2d 495, 501 (9th Cir.1986) (internal quotations omitted).

**27.** *United States v. Loyola–Dominguez,* 125 F.3d 1315, 1318 (9th Cir.1997) (internal quotations omitted).

**28.** *See Orozco,* 590 F.2d at 793–94; *see also United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir.1980).

**29.** *See United States v. Solano–Godines,* 120 F.3d 957, 963 (9th Cir.1997); *see also INS v. Federal Labor Relations Authority,* 855 F.2d 1454, 1465 (9th Cir.1988).

subjective recordation of his aural observations at the scene of the crime as it took place.

Thus the exhibit fell within the criminal case exclusion to the exception for public records.[30] It was admitted in violation of the hearsay rule. In order to put the evidence in the exhibit before the jury, the government should have called Officer Kendall as a witness. No issue arises as to unavailability of the witness, because the government did not claim unavailability and the court did not admit the exhibit based on unavailability. The record shows that Officer Kendall was still employed by the INS, was on sick leave, and was living with his parents, and the government did not claim that he was too sick to come to court. Orellana–Blanco and the government differed sharply on what Orellana–Blanco had said to Officer Kendall, and under the confrontation clause, Orellana–Blanco was entitled to confront Officer Kendall in cross-examination to test the accuracy of what the exhibit claimed Orellana–Blanco had said.

■ The government's final argument is that the error if any was harmless beyond a reasonable doubt.[31] The government concedes that if we find the exhibit inadmissible, as we have, then the false statement conviction could not stand because the exhibit "was the primary evidence supporting this charge." But, the government contends, the evidence of a sham marriage was overwhelming based on the evidence of Beatrice Boehm about her intentions from the start and the overwhelming evidence that Orellana–Blanco did not actually reside with Boehm at her mobile home.

■ We do not agree that the error was harmless. A marriage is a sham "if the bride and groom did not intend to establish a life together at the time they were married."[32] As we held in United States v. Tagalicud,[33] "marriage fraud may be committed by one party to the marriage, or a person who arranged the marriage, yet the other spouse may genuinely intend to marry."[34] Thus if one spouse intended the marriage to be a sham when the ceremony took place, but the other intended it to be genuine, then the one committed marriage fraud but not the other. That Orellana–Blanco married Boehm so that he could get a green card does not make the marriage a sham, though it is evidence that might support an inference of a sham marriage. We held in Tagalicud that "motivations are at most evidence of intent, and do not themselves make the marriages shams."[35] Just as marriages for money, hardly a novelty, or marriages among princes and princesses for reasons of state may be genuine and not sham marriages, so may marriages for green cards be genuine. An intent to obtain something other than or in addition to love and companionship from that life does not make a marriage a sham. Rather, the sham arises from the intent not "to establish a life together."[36]

---

30. Fed.R.Evid. 803(8)(B).

31. *See United States v. Bowman*, 215 F.3d 951, 961 (9th Cir.2000) (evidence admitted in violation of confrontation clause "must be shown [to be] harmless beyond a reasonable doubt."); *Pena-Gutierrez*, 222 F.3d at 1089.

32. *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir.1975); *accord Baria v. Reno*, 180 F.3d 1111, 1113–14 (9th Cir.1999).

33. 84 F.3d 1180 (9th Cir.1996).

34. *Id.* at 1185.

35. *Id.*

36. *Bark*, 511 F.2d at 1201. The jury was instructed in the case at bar that "[a] sham marriage is a marriage entered into for the purpose of evading the immigration laws." We do not reach the question whether the instruction would require reversal under *Tagalicud* because that question is not raised. But the instruction exacerbated the potential harmfulness of the evidentiary error.

The jury could have concluded from the evidence that, although Boehm never intended a genuine marriage, Orellana–Blanco did. They could have concluded that, while his motivation for marriage was love for a green card rather than love for Boehm, nevertheless he planned to live with Boehm as her husband. The jury might infer that he wouldn't have been willing to mow her lawn, clean her house, and lay her carpet without getting paid for it, unless he saw these chores as a husband's or prospective husband's duties. The jury could have believed Orellana–Blanco and disbelieved Boehm regarding their sexual relations. The jury could have concluded that he wanted to move in with Boehm from the start, and didn't only because she insisted she needed time to break the news to her son, and then needed more time to accommodate her son to the marriage. And it could have concluded, if it believed Orellana–Blanco and his surgeon, that Boehm acted consistently with being Orellana–Blanco's wife until he lost his sexual abilities after his surgery, at which time she left him for the rancher. It did not have to believe any of this, but it could well have. We accordingly cannot conclude that the error in admitting the exhibit was harmless beyond a reasonable doubt.

The judgment must be REVERSED and the case REMANDED for a new trial.