NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1199-10T2
                    A-2942-10T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANGELIQUE STUBBS a/k/a ANGELIQUE
HERNANDEZ,

     Defendants-Appellants.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JULES L. STUBBS a/k/a PEPE,

     Defendants-Appellants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **November 7, 2013** |
| **APPELLATE DIVISION** |

Telephonically argued February 7, 2013 (A-1199-10) and Argued February 5, 2013 (A-2942-10) - Decided August 15, 2013

Before Judges Lihotz, Ostrer and Kennedy.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 07-07-0618.

Frank M. Gennaro, Designated Counsel, argued the cause for appellant Angelique Stubbs (A-1199-10) (Joseph E. Krakora, Public Defender, attorney; Mr. Gennaro, on the briefs).

G. Harrison Walters, Assistant Prosecutor, argued the cause for respondent State of New Jersey (A-1199-10) (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Mr. Walters, of counsel and on the brief).

Laura B. Lasota, Assistant Deputy Public Defender, argued the cause for appellant Jules L. Stubbs (A-2942-10) (Joseph E. Krakora, Public Defender, attorney; Ms. Lasota, of counsel and on the brief).

Teresa A. Blair, Deputy Attorney General, argued the cause for respondent State of New Jersey (A-2942-10) (Jeffrey S. Chiesa, Attorney General, attorney; Ms. Blair, of counsel and on the brief).

Appellant Jules Stubbs filed a pro se supplemental brief.

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendants, Angelique and Jules Stubbs,[1] husband and wife, separately appeal from their convictions, after a jury trial, of fourth-degree possession of marijuana, N.J.S.A. 2C:35-10a(3); second-degree possession of marijuana with intent to distribute, N.J.S.A. 2C:35-5a(1) and -5b(10)(b); and third-degree possession of marijuana with intent to distribute it within 1000 feet of a school, N.J.S.A. 2C:35-7. Angelique received an aggregate sentence of seven years, with no period of parole ineligibility.

---

[1] We refer to defendants by their first names, or as "defendants" collectively. We mean no disrespect by this informality.

A-1199-10T2

Jules received an aggregate term of ten years, with a five-year period of parole ineligibility.

We consolidate their back-to-back appeals for the purposes of this opinion. Each defendant separately raises numerous issues in challenging their convictions, but they both challenge the court's denial of a motion to suppress the fruits of a search of their home; and the court's denial of a motion for a mistrial based on extraneous contacts with jurors. Jules also challenges his sentence as excessive.

We affirm as to Jules. We remand for a hearing as to the admissibility of a currency seizure form that Angelique signed. The State argued Angelique's signature represented a claim she owned a substantial amount of cash that officers seized, which the State argued was connected to drugs. If the State does not prove that the document was properly admitted as an adoptive admission, as we discuss below, then the document shall be suppressed, the conviction reversed, and a new trial ordered. In all other respects, Angelique's conviction is affirmed.

I.

We summarize the trial evidence, and discuss the facts in greater detail in our discussion of the legal issues.

On January 8, 2007, three individuals, one of them armed, invaded defendants' home sometime after 8:00 p.m. Present were

Angelique and her three children — daughters who were six and seven, and a son who was eleven. Angelique had recently returned home from work as a registered nurse at a hospital. Jules had left the home after Angelique arrived.

Angelique was first confronted by one of the invaders as she lay on her bed, watching television with her youngest daughter. The man asked for Daniel. Angelique responded that no one named Daniel lived at the home. The man closed the bedroom door. Angelique dialed 911 on her cordless phone, but the call was cut off because the battery died.

The same man, later identified as Joseph Houchens, returned to the room with a shotgun, grabbed Angelique firmly by the arm, and told her to come with him. Angelique told her daughter to wait in the room. Her son was in the bathroom, and her middle child was still in the kitchen, crying.

The man with the gun demanded to know where the drugs and money were located. Angelique told them she did not know about any money or drugs. Houchens grabbed Angelique by her face. She said that he told her that she better think of her kids, and stop lying. He repeatedly told her that she was making him angry. Angelique continued to profess ignorance, as the intruders forced her into the basement to continue the search. The intruders also entered the garage, and searched a

A-1199-10T2

refrigerator.  The three intruders were tossing personal items, lifting seat cushions, and searching furniture and containers. Eventually, Angelique was permitted to direct all three children to remain in the bathroom.

Meanwhile, the Millville Police Department was able to trace the dropped 911 call, and initially sent officer Jennifer Gentile, who was familiar with the Stubbses.  Houchens answered the door, then immediately locked it.  Gentile also detected movement in the garage.  She suspected foul play.  She called for backup, and Officer James Grone and Sgt. Ronald Harvey arrived.  It was shortly before 9:00 p.m.  Gentile knocked at the door again.  Houchens had ordered Angelique to persuade the police to leave.  Angelique was crying and upset.

The man who initially answered the door returned with Angelique.  He had his arm around her.  She appeared frightened and shaken to Gentile.  Angelique broke free of the man and rushed to the police, telling them that there were other men in the house, they had guns, and the children were inside.  The man at the door tried to flee, but was quickly restrained.

The three officers then entered with their guns drawn to find and protect the children, and to arrest the intruders. Officer Grone announced the police officers' presence.  Three

small children exited from a bathroom and were directed to leave the house.

The officers then proceeded to search the house for the intruders. In the course of searching a child's room closet for an intruder, Grone uncovered a large bag of marijuana. During the search of the master bedroom, one suspect was found hiding in another closet. Another suspect, Thomas Wright, was found hiding beside a bed. In a search incident to arrest, the police seized $4831 from his person. Police also entered the garage, where they found a shotgun in plain view.

After the house was secured and cleared of intruders, police asked Angelique for consent to conduct a further search. She refused, and police obtained a search warrant. Pursuant to that search warrant, police removed the large bag of marijuana. It consisted of 5.7 pounds of marijuana packaged in six gallon-size plastic bags. Also seized were several items from the master bedroom closet: small sandwich bags; scented dryer sheets; empty gallon-size plastic bags; and a scale. The police also seized $218 in a bedroom bureau drawer.

After Jules was summoned home by his wife, the police Mirandized[2] him and asked him about the seized drugs and money.

---

[2] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

According to Harvey, while he questioned Jules in the master bedroom, Jules nodded his head toward the children's bedroom and said, "'That stuff's mine[,]" and "I'll take it." Jules extended his arms out, as if to invite the officer to handcuff him. On the other hand, Jules declined to specify what he meant by the "stuff." Jules also denied any knowledge about the seized currency. After Harvey ceased questioning Jules, Jules volunteered that he did not want his wife in trouble and "he was taking the blame for anything."

Angelique was taken to the police station for questioning. In a recorded statement to Gentile, Angelique recounted the home invasion. She stated that Houchens had removed a "handful" of money from the bedroom closet, and then asked where the rest of the money was. Angelique stated she had no knowledge of the amount. After obtaining additional details of the home invasion, Gentile administered <u>Miranda</u> warnings and questioned Angelique about the marijuana and the large amount of cash found in the home. She said she was unaware of any controlled dangerous substance or large amounts of cash in the home.[3]

At some point, Det. Joseph Hoydis, the evidence officer, asked Angelique to sign a form entitled "United States Currency

---

[3] As we discuss below, a redacted version of Angelique's statement was introduced into evidence.

Seizure Report" (CSR), which itemized the $4831 seized from Wright. The form identified Angelique as "claimant." Jules signed a similar form regarding the $218.

The State's witnesses were the three officers who first responded to the home invasion — Gentile, Harvey and Grone; Det. Sgt. Carl Heger, who searched the basement; Hoydis, the evidence officer; and an expert in drug distribution, Det. Dominic Patitucci. Gentile, Harvey, Heger, and Hoydis all testified that they detected a strong odor of raw marijuana in the home. Angelique testified that she detected an odor as well, but insisted none was present prior to the invasion. The State suggested that the marijuana may have been stored in the refrigerator in the garage.

In its case against defendants, the State relied on Jules's admissions; the presence in his home of almost six pounds of marijuana packaged in six one-gallon bags, and a small bag of marijuana; the presence of a scale to weigh marijuana, plastic bags to package it, and scented dryer sheets to mask the scent of it; and the large amount of cash found in the home, in denominations that Patitucci stated were common in drug transactions. Jules did not testify. Through cross-examination and argument, he attempted to suggest that his admissions were directed to the small amount of marijuana in the home. He also

tried to suggest that the home invaders brought the cash and marijuana with them.

In its case against Angelique, the State attempted to discredit her claims of ignorance of the drugs in the home. The State highlighted the implausibility of keeping kitchen items like the plastic bags, and laundry items like the dryer sheets, in the master bedroom closet, as opposed to the kitchen and the basement laundry room. The State also relied substantially on the CSR, referring to it in both its opening and closing statement. The State argued Angelique acknowledged ownership of the $4831 by signing the form. The State also demonstrated inconsistencies between Angelique's statement to police and her trial testimony.

Angelique testified in her own defense and also called two character witnesses. Angelique recounted the events of the home invasion. Although she did not deny she signed the CSR, she stated she had no recollection of it, nor any explanation of its significance, explaining that she was upset and signed it because she believed her signature was required. In closing, she argued, had she known of the presence of the drugs and large amounts of money, she would have disclosed that to the intruders rather than risk her and her children's safety. She also argued that she did not understand the CSR form to constitute a claim

of ownership of the $4831. Angelique also emphasized her repeated denials of knowledge of the money in her formal statement.

Before summations, the court denied a motion for acquittal, which defendants made at the close of the State's case, but asked that the court reserve decision until the close of all evidence.

[At the direction of the court, the published version of this opinion omits the discussion of the extraneous contacts with jurors and the subsequent motion for a mistrial. See R. 1:36-3.]

The jury deliberated less than half a day and returned guilty verdicts on all counts. Before her sentencing, and twenty-three days after the verdict, Angelique sought a new trial based on the court's failure to individually question each juror about the extraneous contacts. The court denied the motion. Angelique's sentence was based on a finding of aggravating factor three, the risk that defendant would re-offend; factor six, her prior criminal record and the seriousness of the offenses of which she was convicted; and factor nine, the need for deterrence, because it "applies in every case of this type and is given moderate weight." See N.J.S.A. 2C:44-1a(3), (6), (9). The court found no mitigating

factors.  See N.J.S.A. 2C:44-1b.  Angelique was sentenced to seven years on the possession of a CDS with intent to distribute charge (count two); and four years concurrent for possession of a CDS with intent to distribute within a school zone (count three).  The court declined to impose a parole ineligibility period.  The possession of a CDS charge (count one) was merged with count two.

In his statement before sentencing, Jules apologized to the court and his wife, and stated "[s]he had nothing at all to do with" it; "she had no knowledge of anything that was going on." He blamed lawyers for his failure to "take what I should have tooken [sic]," and suggested Angelique's lawyers persuaded her not to testify against him.

[At the direction of the court, the published version of this opinion omits the discussion of Jules's sentence.  See R. 1:36-3.]

II.

Both defendants challenge the search of the closet that led to the seizure of the large amount of marijuana.  Angelique argues in Point I:

> THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.

Jules argues in his Point II:

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE THE BAG OF MARIJUANA FOUND IN THE SMALLER BEDROOM WAS NOT DISCOVERED IN PLAIN VIEW.

Both defendants also argue the court erred in its response to the report of the uniformed officer's comment to a jury. Angelique argues in her Point V:

THE TRIAL COURT'S FAILURE TO PROPERLY INVESTIGATE THE EXPOSURE OF THE DELIBERATING JURORS TO EXTRANEOUS COMMENTS WHICH HAD THE CAPACITY TO TAINT THE JURY DENIED DEFENDANT A FAIR TRIAL.

Jules argues in his Point III:

THE TRIAL COURT FAILED TO PROPERLY INVESTIGATE PREJUDICIAL COMMENTS MADE BY A CORRECTIONS OFFICER TO JURORS AND FAILED TO GRANT DEFENDANT'S REQUEST FOR A MISTRIAL, THEREBY DENYING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL AND BY AN IMPARTIAL JURY. (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. I, PARS. 1 AND 10).

Angelique presents the following additional points:

POINT II — THE TRIAL COURT'S REDACTION OF DEFENDANT'S STATEMENT TO THE POLICE, WHICH SUPPRESSED DEFENDANT'S EXCULPATORY STATEMENTS IN ORDER TO PERMIT A JOINT TRIAL, DENIED DEFENDANT A FAIR TRIAL.

POINT III — THE STATE'S USE OF DEFENDANT'S SIGNATURE ON A UNIFORM CURRENCY SEIZURE REPORT FORM AS SUBSTANTIVE EVIDENCE OF DEFENDANT'S OWNERSHIP OF SEIZED MONIES WAS PLAIN ERROR.

POINT IV — THE REPEATED REFERENCES TO THE APPROVAL OF A SEARCH WARRANT DENIED DEFENDANT A FAIR TRIAL.

POINT VI — THE TRIAL COURT UTILIZED AN IMPROPER STANDARD IN CONSIDERING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.

POINT VII — THE PROSECUTOR'S IMPROPER COMMENTS DURING HIS SUMMATION CONSTITUTED PROSECUTORIAL MISCONDUCT WHICH DENIED DEFENDANT A FAIR TRIAL.

POINT VIII — THE PROSECUTOR IMPROPERLY BOLSTERED HIS EXPERT'S TESTIMONY.

Jules presents the following additional points in support of his appeal:

POINT I — BECAUSE THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SEVER WITHOUT CONSIDERING WHETHER THE MARITAL PRIVILEGE REQUIRED SEVERANCE, DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN HIS WIFE TESTIFIED ON HER OWN BEHALF, THEREBY MAINTAINING HER INNOCENCE AND INCRIMINATING HIM IN THE OFFENSES. (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. I, PARS. 1 AND 10). (Partially Raised Below).

POINT IV — THE ADMISSION OF THE DEFENDANT'S ORAL STATEMENTS WITHOUT A LIMITING INSTRUCTION FOCUSING THE JURY'S ATTENTION AS TO THE AMBIGUOUS NATURE OF THOSE STATEMENTS, VIOLATED N.J.R.E. 403, WHICH SPECIFICALLY PROVIDES FOR THE EXCLUSION OF HIGHLY PREJUDICIAL EVIDENCE. (Not Raised Below).

POINT V — THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below).

PONT VI — THE SENTENCE IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE, AND SHOULD BE REDUCED.

13

Jules raised two additional points in a supplemental pro se brief:

> POINT I — THE TRIAL COURT ERRED IN NOT SUPPRESSING DEFENDANT ORAL STATEMENT AT THE MIRANDA HEARING WHERE THE EVIDENCE SHOWED DEFENDANT WAIVER OF MIRAND RIGHT WAS NOT KNOWING AND INTELLIGENT WHERE THE ARRESTING OFFICER'S NEVER INFORMED DEFENDANT PRIOR TO GIVING THE MIRANDA WARNING OF HIS TRUE STATUS AS TO WHY HE WAS BEING DETAINED AND ARRESTED UPON ENTERING HIS WIFE HOUSE ON THE DATE THE HOME INVASION HAD OCCURRED THEREBY VIOLATING DEFENDANT CONSTITUTIONAL RIGHTS AGAINST SELF-INCRIMINATION AND A FAIR TRIAL <u>U.S. CONST.</u> AMEND. 5, 6 AND <u>N.J. CONST.</u> ART. I. PAR. 10. (Partially Raised Below).
>
> PONT II — THE STATE FAILURE TO CORRECT SGT. HARVEY PERJURED TESTIMONY AT DEFENDANT TRIAL JURY VIOLATED DEFENDANT CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW. <u>U.S. CONST.</u> AMEND. 6, 14 AND <u>N.J. CONST.</u> ART. I. PAR. 10. (Not Raised Below).

### III.

[At the direction of the court, the published version of this opinion omits Part III-A, addressing the motion to suppress, and Part III-B, addressing the motion for a mistrial based on extraneous contacts with jurors. <u>See</u> <u>R.</u> 1:36-3.]

### C.

We next consider Angelique's argument that the court committed plain error when it admitted the CSR. We agree that the court was obliged to conduct a hearing pursuant to <u>N.J.R.E.</u> 104(c) to determine the report's admissibility. We view the

failure to do so as plain error, given the State's reliance on the CSR in persuading the jury of Angelique's guilt.

We review additional facts relevant to the CSR. As we noted, Angelique did not recall signing the CSR, nor did she recall any explanation of its meaning. The form does not indicate precisely when it was signed, although it is dated January 9, 2007. It was apparently signed at the police station. Hoydis testified "it might have been past midnight" when he obtained her signature, but the date indicates it must have been past midnight. Angelique testified she signed it in the early morning. Consequently, she signed the form after her Mirandized statement to Gentile, which concluded at 11:55 p.m. on January 8, 2007.

Angelique said she did not recall meeting with Hoydis at the police station because she was still traumatized by the events that evening. She testified, "I don't recall signing the forms that I did sign. They . . . provided me with forms and I signed them. I thought it was part of the process that I was required to sign them."

Hoydis testified that he obtained Angelique's signature, which was witnessed by fellow officer Carl Heger. Hoydis could not recall specifically what he told Angelique about the form, but he stated he invariably informed persons, whom he asked to

sign a CSR, that his or her signature would constitute a claim of ownership of the seized funds.

> [E]very time I fill one of them forms out, when I have the subject who the money is being seized from, I ask them, I say can you sign this? This is stating that you're claiming the money so that if court proceedings come or don't, you can get your money back.

Although Heger testified briefly at trial about his involvement in the house search, he was not questioned about the circumstances of Angelique's execution of the CSR.

Hoydis acknowledged that the form did not explicitly state in plain English that it was an acknowledgment of ownership. He also conceded that the money itemized on the CSR Angelique signed was not seized from her. Hoydis testified he was told the money was Angelique's, and he believed Harvey directed him to obtain Angelique's signature on the form.

The CSR in this case is the equivalent of an adoptive admission. Consequently, it was incumbent upon the court to analyze it pursuant to N.J.R.E. 803(b)(2). As the CSR was a statement of a criminal defendant, N.J.R.E. 803(b) required the court to determine the document's admissibility in a preliminary hearing pursuant to N.J.R.E. 104(c).

As Hoydis admitted, the document itself does not expressly state that Angelique asserted ownership of the $4831. The

inclusion of the word "claimant," unaccompanied by any other explanation within the document, is vague in its meaning. The word is not highlighted, and its significance could easily be overlooked, or misconstrued. The State does not rely solely on the wording of the document itself, and instead emphasizes the context in which it was signed. It also argues that Angelique's execution of the form constituted a claim of ownership because Hoydis first informed her that her execution of the form would constitute a claim of ownership, and she allegedly assented by thereafter signing the form. Properly viewed, the State sought to use the form as Hoydis explained it as an adoptive admission, that is, "a statement whose content the party has adopted by word or conduct[.]" N.J.R.E. 803(b)(2).

In order to introduce into evidence Angelique's adoption of Hoydis's characterization of the form, the State was required to satisfy two criteria. "First, the party to be charged must be aware of and understand the content of the statement allegedly adopted." McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 529 (2003) (citation omitted). "Second, it must be clear that the party to be charged with the adoptive admission 'unambiguously assented' to the statement." Id. at 530 (quoting State v. Briggs, 279 N.J. Super. 555, 563 (App. Div.), certif. denied, 141 N.J. 99 (1995)). Moreover, the State, as the

proponent of the adoptive admission, was assigned the burden of persuasion that the out-of-court statement satisfied the elements of an exception to the general rule of inadmissibility. See State v. James, 346 N.J. Super. 441, 457 (App. Div.) (stating proponent of hearsay must establish prerequisites of admissibility by a preponderance of the evidence), certif. denied, 174 N.J. 193 (2002); see also Weinstein's Federal Evidence § 801.31[2] (2d ed. 1997) (stating proponent of adoptive admissions has the burden of proving by a preponderance of the evidence "that the party's conduct manifested an intent to adopt the statement").

Had the CSR clearly stated that the signer acknowledged ownership of the itemized currency, and if there were proof that Angelique read the document before signing it, then Angelique's signature would be strong evidence of her adoption. "Ordinarily a signed statement, even if written by another in another's words, would be adopted as the party's own if he signed it, because signing is a manifestation of adopting the statement." United States v. Orellana-Blanco, 294 F.3d 1143, 1148 (9th Cir. 2002). However, the CSR contained no such statement of ownership; Hoydis allegedly imputed that meaning to the document. Also, even if Hoydis is believed, Angelique testified

she felt required to sign the document and does not recall the meaning assigned to it.

In Orellana-Blanco, supra, the court held the trial court erred in admitting a signed document as an adoptive admission. Unlike here, there was no question about whether the document's full meaning was self-contained. However, the document was inadmissible as an adoptive admission because the government had failed to establish that the defendant, whose English skills were limited, actually read and understood what he signed. Id. at 1148.

The same principle applies here. There is a significant issue whether Hoydis provided the explanation, since he has no specific recollection of it, and Heger did not testify about it. There is also question whether Angelique listened to Hoydis's explanation (assuming it was given), and understood him, since she was traumatized and distracted. The State presented no evidence to pinpoint when or where Angelique signed the document, except it is clear it was after midnight after a long and tumultuous night, and Angelique was apparently in custody in the police station. There is no evidence regarding her demeanor when she signed it; nor whether she appeared to study and read it, or swiftly signed it without pause. It is also doubtful that Angelique would have signed the form to indicate her

19 A-1199-10T2

adoption, and ownership of such a large amount of currency about which, she had just told Gentile she was unaware.

We view the failure to conduct a hearing under N.J.R.E. 104 to be plain error. First, we cannot conclude the failure to conduct a hearing was of no moment. The trial record does not clearly establish that the State met its burden to support admissibility. The State did not present sufficient proofs that Angelique was "aware of and underst[oo]d" the form, and "'unambiguously assented'" to it. McDevitt, supra, 175 N.J. at 530.

Second, introduction into evidence of the CSR, as Hoydis explained it, was "clearly capable of producing an unjust result." R. 2:10-2. "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)); see also State v. Kemp, 195 N.J. 136, 149 (2008) ("[W]e focus on 'whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits[.]'") (quoting Macon, supra, 57 N.J. at 338)).

The proofs against Angelique were substantially weaker than they were against Jules. But for the CSR, she denied any

connection to drugs and drug proceeds. Strong circumstantial evidence supported her theory of the case. She tried to call 911. Had she been aware of the location of drugs and the large amount of money, she likely would have disclosed it to the home invaders who threatened her and her children. According to her version of the home invasion — and there was no other version — she repeatedly professed her ignorance. According to her statement to Gentile, she did direct the robbers to the "handful of cash" in the closet, but the robbers demanded the rest. Angelique claims she said she did not know where it was.

We recognize the weakness in Angelique's explanation about the drug paraphernalia in the master bedroom closet. If the bags and dryer sheets were used as designed — for food storage and laundry — they presumably would have been kept elsewhere. Angelique's trial recitation of the events of the home invasion also differed in various respects from her version given to police almost two years earlier. In her direct testimony, she omitted mention of the robbers' demand for drugs, and insisted she did not enter the garage with the robbers. Yet, a jury may have concluded that Angelique knew her husband was dealing drugs, but personally took no part in his activities and was ignorant of the details.

A-1199-10T2

The CSR was a critical element of the State's case that Angelique was an active participant. Once she allegedly claimed as her own the $4831, which Patittucci opined were drug proceeds, she became a partner in the drug business. The State argued in opening:

> Angelique, who you're going to see in this case, who denied on several occasions really knowing anything about the drugs or the money, signed a receipt for those monies. Even though — you're going to see her statement.
>
> Even though in her statement she tells police, I really don't know anything about the money. I don't know how much money was there or anything like that. But she signed a very particular, itemized statement as the claimant for that money.

In summation, the State again relied on the CSR and recalled Hoydis's interpretation of the agreement, to rebut the defense's argument that Angelique, who was a registered nurse, was an innocent spouse.

> Does that mean she can't be a drug dealer? . . .
>
> She's smart enough to know better but she engaged in this and why? That brings us to our next point; the third admission, if you will. Two from Jules; one from Angelique.
>
> . . . .
>
> Both Detective Hoydis and Harvey explained what this form was for. As you can imagine, when you seize money, cash, it

22

gets to be a little sticky so you have to make sure the i's are dotted and t's are crossed.

The suggestion is that it was not explained to her when everything else was? No. Ask yourselves this and I'm sure you have.

. . . .

It's called greed, ladies and gentlemen. The lure o[f] money. I don't know anything but if you're putting this in my face, I'm going to sign it. $5,000 worth of cash. It's greed.

That money was broken down and Detective Patitucci went through all that[.]

The State returned to the form later in summation, arguing that the money she admitted in her statement was removed from the closet, was the money itemized in her CSR, and not the $218 in the CSR Jules signed. In sum, absent the CSR, there is reasonable doubt whether the jury would have reached the same result.

However, it would be premature for us to reverse Angelique's conviction. Rather, we remand to the trial court to conduct a Rule 104(c) hearing in accord with our decision. If the trial court determines that the State has not met its burden to establish the CSR was admissible as an adoptive admission, then a new trial shall be ordered. On the other hand, if the court is persuaded that Angelique adopted Hoydis's explanation

23

of the form, then the evidence was properly presented to the jury, and reversal would not be warranted. See State v. Kelly, 61 N.J. 283, 294-95 (1972) (where there was insufficient proof that defendant's confession was voluntary, the Court remanded for a hearing regarding voluntariness, and required reversal and a new trial only if the trial court determined the confession was not voluntary); State v. Herrera, 385 N.J. Super. 486, 500 (App. Div. 2006) (remanding for a hearing, but requiring reversal and a new trial only if the trial court determined that defendant was denied his right to appear in appropriate civilian clothing).

D.

We have carefully reviewed Angelique's and Jules's remaining points in light of the applicable law and facts, and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

[At the direction of the court, the published version of this opinion omits the court's discussion of the trial court's denial of Jules's severance motion, and Jules's sentence. See R. 1:36-3.]

Affirmed as to Jules, Docket No. A-2942-10. Remanded for further proceedings consistent with this opinion as to Angelique, Docket No. A-1199-10.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24

A-1199-10T2